# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| IMERYS TALC AMERICA, INC., et al., | : |
| | : BK Case No.  No. 19-10289 (LSS) |
| Debtors. | : |
| | : |
| CYPRUS HISTORICAL EXCESS | : C.A. No. 19-944 (MN) |
| INSURERS, | : BAP No. 19-39 |
| | : |
| Appellant, | : C.A. No. 19-1120 (MN) |
| | : BAP No. 19-42 |
| | : |
| v. | : C.A. No. 19-1121 (MN) |
| | : BAP No. 19-43 |
| IMERYS TALC AMERICA, INC., et al. | : |
| | : C.A. No. 19-1122 (MN) |
| Appellees. | : BAP No. 19-44 |

---

**APPELLANTS' CERTAIN EXCESS INSURERS' OPENING BRIEF ON APPEAL
FROM A BANKRUPTCY COURT ORDER APPOINTING JAMES PATTON OF
YOUNG CONAWAY AS FUTURE CLAIMANTS' REPRESENTATIVE**

---

**O'MELVENY & MYERS LLP**
Tancred Schiavoni
Janine Panchok-Berry
Times Square Tower
7 Times Square
New York, NY  10036
Telephone: 212-326-2000
tschiavoni@omm.com
jpanchok-berry@omm.com

**STAMOULIS & WEINBLATT LLC**
Stamatios Stamoulis
800 N. West Street, Third Floor
Wilmington, Delaware  19801
Telephone:   302 999 1540
Facsimile:    302 762 1688
stamoulis@swdelaw.com

# TABLE OF CONTENTS

**Page**

STATEMENT OF APPELLATE JURISDICTION ................................................................ 6

PRELIMINARY STATEMENT ................................................................................. 7

STATEMENT OF THE ISSUES ................................................................................ 8

STANDARD OF REVIEW .................................................................................... 9

STATEMENT OF THE CASE ................................................................................. 9

          A. THE CRITICAL ROLE THAT AN FCR PLAYS IN BANKRUPTCY CASES. ............. 9

          B. THE FCR'S RETENTION, CONFLICTS AND APPROVAL IN THIS CASE. ........... 12

          Mr. Patton was hired by the Debtors eight months
          before the filing of the bankruptcy on Sept. 25, 2018. ........................................ 12

          Mr. Patton could only name one instance in the last 20 cases as FCR
          where he disagreed with the current claimants' committee................................. 13

          Mr. Patton's firm, Young Conaway, represents Continental Insurance and
          other Certain Excess Insurers in substantially related matters............................ 15

          Mr. Patton and Young Conaway agreed with Imerys
          to keep its prepetition retention a secret, preventing
          their clients from giving informed consent for a waiver..................................... 17

          Young Conaway's solicitation and
          representation of current talc claimants. ........................................................... 18

          Certain Excess Insurers were prevented from obtaining discovery on the
          production of privileged, common-interest documents to the FCR................... 20

ARGUMENT .............................................................................................. 22

    I.     THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW BECAUSE WHILE
          THE BANKRUPTCY COURT ADOPTED THE GUARDIAN-AD-LITEM STANDARD,
          THE COURT DID NOT APPLY THAT STANDARD TO THE FCR'S RETENTION............. 22

          A.     While the Bankruptcy Court correctly chose to evaluate the FCR's
                 conflicts under the guardian-ad-litem test, it misapplied that
                 standard here. ..................................................................................... 23

          B.     The FCR never revealed its actual, concurrent conflicts until the
                 retention hearing. ................................................................................ 29

          C.     Even under the disinterested standard, the FCR should not have
                 been approved here because that rule per se prohibits concurrent
                 conflicts of interest................................................................................ 32

    II.    THE BANKRUPTCY COURT ERRED BY APPOINTING MR. PATTON AND HIS
          FIRM IN LIGHT OF THE CONFLICTS OF INTEREST WITH CERTAIN EXCESS
          INSURERS. .......................................................................................... 36

**TABLE OF CONTENTS**

(continued)

A.     The Bankruptcy Court abused its discretion by holding that the concurrent conflict of interest with Certain Excess Insurers could be waived through a prospective, open-ended waiver. ........................... 37

B.     The Bankruptcy Court erred as a matter of law by suggesting an ethical wall eight months after the conflict arose. ................................. 40

C.     The Bankruptcy Court could not have reached the right decision on conflicts because it refused to allow the necessary factual development. ....................................................................................... 43

CONCLUSION ..................................................................................................... 46

**Cases**

*American Printers and Lithographers, Inc.*,
  148 B.R. 862 (Bankr. N.D. Ill. 1992) ........................................................ 24

*Atasi Corp. v. Seagate Technology*,
  847 F.2d 826 (Fed.Cir.1988) ..................................................................... 33

*Bullard v. Blue Hills Bank*,
  135 S. Ct. 1686, 191 L. Ed. 2d 621 (2015) ................................................. 1

*Decora Inc. v. DW Wallcovering, Inc.*,
  899 F. Supp. 132 (S.D.N.Y. 1995) ............................................................. 33

*Elonix I.P. Holdings, Ltd. v. Apple Computer, Inc.*,
  142 F. Supp. 2d 579 (D. Del. 2001) ...................................................... 29, 31

*EZ Paintr Corp. v. Padco, Inc.*,
  746 F.2d 1459 (Fed.Cir.1984) ................................................................... 33

*Fed. Ins. Co. v. Grace*,
  No. CIV.A. 04-844, 2004 WL 5517843 (D. Del. Nov. 22, 2004) ............... 6

*In re Amdura*,
  121 B.R. 862 (Bankr.D.Colo.1990) ........................................................... 26

*In re B.E.S. Concrete Prod., Inc.*,
  93 B.R. 228 (Bankr. E.D. Cal. 1988) ......................................................... 25

*In re B.E.S. Concrete Prods., Inc.*,
  93 B.R. 228 (Bankr.E.D.Cal.1988) ............................................................ 35

*In re C&C Demo, Inc.*,
  273 B.R. 502 (Bankr. E.D. Tex. 2001) ....................................................... 38

*In re Cendant Corp. Sec. Litig.*,
  124 F. Supp. 2d 235 (D.N.J. 2000) ............................................................ 27

*In re Congoleum Corp.*,
  426 F.3d 675 (3d Cir. 2005) ...................................................................... 24

*In re Diamond Mortg. Corp. of Illinois*,
  135 B.R. 78 (Bankr. N.D. Ill. 1990) .............................................. 24, 26, 38

*In re Duro Dyne*,
  No. BR 18-27963 (MBK), 2019 WL 4745879 (D.N.J. Sept. 30, 2019) ...... 6, 35, 36

*In re Envirodyne Indus., Inc.*,
150 B.R. 1008 (Bankr. N.D. Ill. 1993) ................................................................. 38

*In re eToys, Inc.*,
331 B.R. 176 (Bankr. D. Del. 2005) ............................................................... 25, 35

*In re EWC, Inc.*,
138 B.R. 276 (Bankr. W.D. Okla. 1992) .............................................................. 38

*In re Fairbanks Co.*,
601 B.R. 831 (Bankr. N.D. Ga. 2019) ............................................................ 20, 22

*In re Filene's Basement, Inc.*,
239 B.R. 845 (Bankr. D. Mass. 1999) ................................................................. 38

*In re First Jersey Sec., Inc.*,
180 F.3d 504 (3d Cir. 1999) ................................................................................ 24

*In re Fleming Cos.*,
305 B.R. 389 (Bankr. D. Del. 2004) .................................................................... 24

*In re Glenn Elec. Sales Corp.*,
89 B.R. 410 (Bankr.D.N.J.), *aff'd*, 99 B.R. 596 (D.N.J.1988) ........................... 23

*In re IH 1, Inc.*,
441 B.R. 742 (Bankr. D. Del. 2011) .................................................................... 29

*In re Keeley & Grabanski Land P'ship*,
No. BR 10-31482, 2013 WL 2384100 (Bankr. D.N.D. May 30, 2013) ................. 24

*In re Kendavis Indus. Int'l, Inc.*,
91 B.R. 742 (Bankr. N.D. Tex. 1988) .................................................................. 26

*In re Lee*,
94 B.R. 172 (Bankr. C.D.Cal. 1988) ................................................................... 26

*In re Leslie Fay Cos.*,
175 B.R. 525 (Bankr. S.D.N.Y. 1994) ................................................................. 35

*In re Martin*,
817 F.2d 175 (1st Cir.1987) ................................................................................ 23

*In re Marvel Entm't Grp., Inc.*,
140 F.3d 463 (3d Cir. 1998) ............................................................................ 6, 23

2

*In re Meridian Auto. Sys.-Composite Operations, Inc.*,
340 B.R. 740 (Bankr. D. Del. 2006) ................................................................. 23, 29

*In re Park-Helena Corp.*,
63 F.3d 877 (9th Cir. 1995) ................................................................................. 38

*In re Perry*,
194 B.R. 875 (E.D. Cal. 1996)......................................................................... 23, 25

*In re Philadelphia Athletic Club, Inc.*,
20 B.R. 328 (E.D.Pa.1982) .............................................................................. 22, 25

*In re Pillowtex*,
304 F.3d 246 (3d Cir. 2002) ............................................................................... 22

*In re Sharon Steel Corp.*,
871 F.2d 1217 (3d Cir. 1989) ............................................................................... 5

*In re The Harris Agency, LLC*,
462 B.R. 514 (E.D. Pa. 2011) ............................................................................. 24

*In re Universal Bldg. Prod.*,
486 B.R. 650 (Bankr. D. Del. 2010) ................................................................... 35

*In re Wheatfield Business Park LLC*,
286 B.R. 412 (C.D. Cal. 2002) ........................................................................... 23

*LaSalle Nat'l Bank v. Lake County*,
703 F.2d 252 (7th Cir.1983) ............................................................................... 32

*Matter of Status Game Corp.*,
102 B.R. 19 (Bankr. D. Conn. 1989) ................................................................... 24

*Mitchell v. Metro. Life Ins. Co.*,
No. 01 CIV. 2112 (WHP), 2002 WL 441194 (S.D.N.Y. Mar. 21, 2002)................. 33

*Papanicolaou v. Chase Manhattan Bank, N.A.*,
720 F.Supp. 1080 (S.D.N.Y.1989) ..................................................................... 33

*Rome v. Braunstein*,
19 F.3d 54 (1st Cir.1994)..................................................................................... 23

*Tran v. Meyers*,
No. 95-2587, 1995 WL 584374 (E.D. Pa. Oct. 2, 1995) ..................................... 26

*U.S. Football League v. Nat'l Football League,*
605 F. Supp. 1448 (S.D.N.Y. 1985) ................................................................. 32

*United States ex rel. Bahsen v. Bos. Sci. Neuromodulation Corp.*,
147 F. Supp. 3d 239 (D.N.J. 2015) ................................................................. 32

**Statutes**

11 U.S.C. § 1104(c) ......................................................................................... 9

11 U.S.C. § 1141(d)(1)(A) ............................................................................... 8

11 U.S.C. § 333(a)(2)(A) ................................................................................. 9

11 U.S.C. § 524(g)(4)(B)(i) ............................................................................. 7

11 U.S.C. §101(14) ...................................................................................... 8, 35

11 U.S.C. §1101(1) ......................................................................................... 9

11 U.S.C. §1104(d) ......................................................................................... 9

11 U.S.C. §327(a) ........................................................................................... 8

11 U.S.C. §332(a) ........................................................................................... 9

11 U.S.C. §524(g)(2)(B)(ii)(V) ....................................................................... 8

11 U.S.C. §524(g)(4)(B)(i) ........................................................................... 2, 9

11 U.S.C. §524(g)(5) ....................................................................................... 8

**Other Authorities**

1 *Collier on Bankruptcy*, § 8.03[1] (15th ed. 2002)..................................... 22

2 Collier on Bankruptcy, ¶ 327.03 .................................................................. 23

9 Collier on Bankruptcy ¶ 2014.03 (15th ed. 2004) ...................................... 35

ABA Model Rules 1.7, Cmt. 6 (5th Ed. 2003) .............................................. 26

Amended Objection of the United States Trustee to Debtor's Motion for an Order
Appointing James L. Patton, Jr., as Legal Representative for Future Asbestos
Claimants, *In re The Fairbanks Co*., No. 18-41768-PWB (Bankr. N.D. Ga.
Dec. 14, 2018)................................................................................................. 21

Charles W. Wolfram, *Modern Legal Ethics* § 7.6.4 (West 1986) ................................................. 33

Letter Ruling dated May 31, 2019, Case No. 19-10289-LSS ...................................................... 29

Mark A. Behrens & William F. Northrip, Department of Justice Combats
    Asbestos Trust Abuse, 86 Def. Couns. J. 1 (2019) ..................................................... 21

Objection of the United States Trustee to the Debtors' Motion for an Order
    Appointing Lawrence Fitzpatrick as Representative for Future Asbestos
    Claimants, *In re Duro Dyne Nat'l Corp*., No 18-27963 (MBK) (Bankr. D. N.J.
    Oct. 1, 2018), available at https://www.justice.gov/opa/press-
    release/file/1096501/download ............................................................................. 21

otice of Appeal and Statement of Election, *In re Duro Dyne Nat'l Corp*., No 18-
    27963 (MBK) (Bankr. D. N.J. Oct. 31, 2018) ......................................................... 21

Peter Kelso & Marc Scarcella, U.S. Chamber Inst. for Legal Reform, "Dubious
    Distribution:  Asbestos Bankruptcy Trust Assets and Compensation" (Mar.
    2018) ....................................................................................................................... 3

*Prepackaged Asbestos Bankruptcies: Down But Not Out*, New York University
    Annals of American Law, Vol. 63, Issue 4 (2008), by Eric Green, Lawrence
    Fitzpatrick, James Patton, Edwin Harron, and Travis Turner ................................. 22

S. Todd Brown, "How Long is Forever This Time?  The Broken Promise of
    Bankruptcy Trusts", 61 Buff. L. Rev. 537 (2013) ..................................................... 3

Statement of Interest on Behalf of the United States of America Regarding Plans
    of Reorganization for Kaiser Gypsum Company, Inc. and Hanson Permanente
    Cement, Inc., *In re Kaiser Gypsum Co., Inc*., No 16-31602 (JCW) (Bankr.
    W.D.N.C. Sept 13, 2018), available at https://www.justice.gov/opa/press-
    release/file/1093916/download .............................................................................. 21

**Rules**

Bankruptcy Rule 2014 .............................................................................................................. 35

D. Del. L.R. 83.6(d) ................................................................................................................. 22

Del. Bankr. L.R. 1001−1(b) ..................................................................................................... 22

Del. RPC 1.7(b)(4) ................................................................................................................... 30

Del. RPC 1.7, Cmt. 19 ............................................................................................................. 30

Model R. Prof'l Conduct 1.7, cmt. [22] .................................................................................... 29

## STATEMENT OF APPELLATE JURISDICTION

The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(a) and (b), and 1334(a), over the chapter 11 bankruptcy cases filed by Imerys Talc America, Inc. and related entities, and issued a number of final orders.

The Bankruptcy Court's June 3, 2019, order appointing a legal representative to represent future asbestos personal injury claimants pursuant to 11 U.S.C. §524(g)(4)(B)(i), its June 3, 2019, order denying motion to compel debtors' responses to discovery in aid of the objection to debtors' motion to appoint a future claims representative, and its June 6, 2019, order authorizing the future claimants' representative to retain and employ counsel pursuant to sections 105(a) and 524(g) of title 11 of the United States Code, 11 U.S.C. §§101 *et seq.* (the "*Bankruptcy Code*"), were all final orders.[1] *See Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1689, 191 L. Ed. 2d 621 (2015) ("Orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case." (internal quotation omitted).

Certain Excess Insurers[2] timely filed a notice of appeal under 28 U.S.C. §158(c)(2) and Fed. R. Bankr. P. 8002(a)(1) on June 14, 2019. This Court has jurisdiction to hear this appeal

---

[1] As a precaution, Cyprus Historical Excess Insurers also filed a notice of appeal on May 21, 2019, fourteen days after Judge Silverstein's May 7 bench preliminary orders on Certain Excess Insurers' Objection to Debtors Motion to Appoint James Patton as Future Claimants' Representative and Certain Excess Insurers' related Motion to Compel.

[2] Certain Excess Insurers: Columbia Casualty Company, Continental Casualty Company, the Continental Insurance Company, as successor to CNA Casualty of California and as successor in interest to certain insurance policies issued by Harbor Insurance Company, Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company), as successor to Employers' Surplus Lines Insurance Company, Stonewall Insurance Company (now known as Berkshire Hathaway Specialty Insurance Company), National Union Fire Insurance Company of Pittsburgh PA, and Lexington Insurance Company to the extent that they issued policies to Cyprus Mines Corporation prior to 1981.

under 28 U.S.C. §158(a)(1), which grants district court's jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.[3]

## PRELIMINARY STATEMENT

The Bankruptcy Court appointed James Patton to serve as the representative for future bodily injury claimants against Debtors—which are claimants who do not yet exist because they have not yet been injured. Because he has no actual clients, the Future Claimants' Representative ("FCR") must answer to the Court, which must therefore carefully scrutinize any conflicts of interest. After applying the rationales from such seminal mass-tort bankruptcy cases as *Johns-Manville*, the Bankruptcy Court applied a fiduciary standard to assess the retention and any conflicts. But the Bankruptcy Court then erred as a matter of law by holding that under this standard, the FCR may waive concurrent conflicts. Here, those conflicts are significant and endured for 8 months while Mr. Patton was prospective FCR. The FCR's law firm concurrently represents several of the Appellant Excess Insurers in other asbestos-related coverage litigation that is substantially similar to the coverage dispute here. The FCR's client constituents did not waive this conflict of interest and he could not prospectively do so for them consistent with his duty as a fiduciary. And Certain Excess Insurers did not waive the conflict of interest either— the conflict being one that was so substantially related to this *Imerys* bankruptcy, a prospective waiver did not apply.

While that conflict should have been the end of the matter, it was not isolated. At the same time that Mr. Patton was supposed to be representing the future claimants, his law partners were soliciting and representing current talc claimants in cases alleging injury from talc that

---

[3] Unless otherwise noted, all Docket references ("Dkt. __") are to *In re Imerys*, Case No. 19-10289, before Judge Laurie Selber Silverstein in Delaware Bankruptcy Court.

Debtors distributed. That fact—which came out for the first time at the retention hearing and was undisputed—is disqualifying because these two sets of claimants have opposing interests in seeking recovery from the same asset pool. After the hearing, Mr. Patton submitted a supplemental declaration stating that his firm no longer represents current talc claimants, though the Court allowed no further examination of this apparent change in position—or any other conflict.

Even under the "disinterested" standard that courts in the Third Circuit have separately applied to FCR retentions in mass tort bankruptcies, there is a *per se* prohibition against concurrent conflicts of interest. Future unknown claimants cannot waive these conflicts. Given the conflicts here, Mr. Patton is *per se* barred from serving as the FCR. In any event, even if the *guardian-ad-litem* standard were not an absolute bar here, the Bankruptcy Court erred in condoning the FCR's concurrent conflicts of interest and in not investigating these conflicts of interest that were revealed at the retention hearing.

## STATEMENT OF THE ISSUES

1.     Whether the fiduciary standard that the Court below ruled applied to Future Claimants' Representatives ("FCR") permits the representative to waive concurrent conflicts of interest.

2.     Whether the Bankruptcy Court erred as a matter of law by approving the retention of Mr. Patton as FCR and pursuant to the applicable fiduciary standard, knowing the following:

   a. Mr. Patton's firm, Young Conaway, represents Certain Excess Insurers in substantially related matters while also seeking from those Certain Excess Insurers proceeds to cover tort claims asserted against the Estate;

b.  Mr. Patton's firm, Young Conaway, simultaneously solicited current talc tort claimants allegedly injured by Johnson & Johnson talc while representing future tort claimants with the same claims;

c.  Mr. Patton would be compelled to waive a concurrent conflict of interest;

d.  Mr. Patton would be compelled to impose an ethical wall 8 months after the concurrent conflict of interest arose;

e.  Mr. Patton and Young Conaway's Rule 2014 disclosures did not disclose its conflicts of interest until they were revealed in open Court;

f.  Certain Excess Insurers were not permitted discovery into these conflicts of interest due to the interests of time in appointing an FCR;

g.  No other FCR candidates were considered; and

h.  Mr. Patton was paid by the Debtors to provide them with pre-bankruptcy services directly related to this bankruptcy case, and that Mr. Patton and Young Conaway agreed with Imerys to keep its prepetition retention a secret, thereby giving Certain Excess Insurers no opportunity to give informed consent for a waiver.

## STANDARD OF REVIEW

Whether the guardian-ad-litem fiduciary standard that the Bankruptcy Court ruled applied to Future Claimants' Representatives permits the representative to waive current conflicts of interest or to cure a conflict by imposing an ethical wall almost a year after the conflict arose. This is a question of law to which plenary review applies. *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989) (appellate court conducts plenary review of conclusions of law).

## STATEMENT OF THE CASE

### A. THE CRITICAL ROLE THAT AN FCR PLAYS IN BANKRUPTCY CASES.

Debtors' stated goal is to confirm a plan of reorganization that resolves their historic talc-related liabilities. The FCR will play a critical role in this process. In contrast to a traditional chapter 11 case, where current creditors and equity holders are the only parties whose rights will be directly affected, a case that seeks a channeling injunction affects the rights of future victims

who have not yet manifested harm from the Debtors' products and who may not even be aware of these bankruptcy cases. For those victims—who may not show signs of illness for years or even decades after the plan is confirmed—the channeling injunction will cut off any right they may have to recover against the reorganized debtors, the Debtors' insurers, and certain related parties and will force them to look exclusively to a post-bankruptcy trust for compensation.[4]

An FCR is a unique type of bankruptcy fiduciary that exists in chapter 11 asbestos cases involving a section 524(g) channeling injunction. *See* 11 U.S.C. § 524(g)(4)(B)(i). The purpose is to protect the due process rights of future asbestos claimants and to ensure that they would receive effective and independent representation. Courts have also acted, pursuant to section 105(a), to appoint bankruptcy fiduciaries to represent future claimants in certain non-asbestos cases where channeling injunctions are sought.[5]

Although the Bankruptcy Code does not specify any particular duties for the FCR, the FCR will typically participate in the negotiation of the plan of reorganization and is supposed to object to any plan that is unfair to future claimants. The FCR is not supposed to be an adjunct to a debtor or to a committee of present claimants. Rather, the FCR is supposed to be an independent fiduciary expected to represent interests that are equally adverse both to a debtor and to all current claimants. As one bankruptcy court has noted, the FCR and present claimants "have a natural antagonism." *In re Quigley Co., Inc.,* No. 04-15739 SMB, 2009 WL

---

[4]     *See In re Federal-Mogul Global Inc*., 684 F.3d 355, 357 (3d Cir. 2012) (section 524(g) injunction "channel[s] all current and future claims based on a debtor's asbestos liability to a personal injury trust").

[5]     *See, e.g., In re TK Holdings, Inc.,* Case No. 17-11375 (BLS) (Bankr. D. Del. Sept. 6, 2017) [Docket No. 703].

9034027, at *5 (Bankr. S.D.N.Y. Apr. 24, 2009).[6]

A debtor, current claimants, and the FCR have conflicting interests regarding the appropriate level of safeguards against invalid or fraudulent claims. So long as there is no threat that the trust funds will be exhausted before their own claims can be paid, first-in-line present claimants may be indifferent to whether fraudulent claims are being allowed along with their own—but they may object to an overly vigilant claims review process that would delay or reduce their own distributions. By contrast, future claimants should have a vital interest in ensuring that the plan contains strong protections against fraud and mismanagement because unchecked payment of non-meritorious claims could well exhaust the trust before all valid future claims can be paid, and they therefore bear a disproportionate share of the harm if the trust is depleted through fraud or mismanagement.

An unconflicted FCR that is loyal to the future claimants only and that will challenge the current claimants, the Debtors, and indeed all interested parties, is thus vital to the creation of a trust.

---

[6]  *See In re Amatex Corp.*, 755 F.2d 1034, 1043 (3d Cir. 1985) ("[B]ecause of the adverse interests of the other parties, it would appear that future claimants require their own representative").

**B. THE FCR'S RETENTION, CONFLICTS AND APPROVAL IN THIS CASE.**

*Mr. Patton was hired by Imerys eight months*
*before the filing of the bankruptcy on Sept. 25, 2018.*

Eight months before filing for bankruptcy, Imerys (the companies that would later become the Debtors) hired Mr. Patton to serve as future claimants' representative. The representatives of the Debtors interviewed him, discussed compensation, and hired him with the expectation that he would negotiate a plan.

In an engagement letter dated September 25, 2018 (the "Prepetition FCR Agreement"),[7] eight months prior to the filing of this bankruptcy, Mr. Patton set forth the terms of his engagement by Imerys.[8] Mr. Patton represented in his letter, directed to Imerys' Vice President and General Counsel, that he had "been asked to serve as the legal representative for future personal injury claimants…in conjunction with discussions and a negotiation regarding a potential plan of reorganization…."[9]

The terms and conditions set forth in the agreement were a "material inducement" to Mr. Patton's engagement.[10] These included:

---

[7]     Imerys (the "Debtors") commenced these Chapter 11 bankruptcy cases on February 13, 2019, (the "Petition Date") to address liabilities for claims alleging personal injury caused by exposure to talc that was mined, processed, and/or distributed by one or more of the Debtors (the "Talc Claims"). There are at least two types of personal injury claims that have been brought against the Debtors:  (a) ovarian cancer arising from talc exposure and (b) mesothelioma or other asbestos-related diseases alleging arising from exposure to asbestos contaminated talc.

[8]     *See* Appendix at APP00000130, Dkt. 100-4, Debtors' Motion to Appoint James Patton, at Exhibit C, Prepetition FCR Agreement, p. 1.

[9]     *See* Appendix at APP00000130, Dkt. 100-4, Debtors' Motion to Appoint James Patton, at Exhibit C, Prepetition FCR Agreement, p. 1.

[10]    *Id.*

- Debtors would pay all fees and expenses incurred by Mr. Patton and his professionals prior to the chapter 11 filing, including those incurred prior to and during the negotiation of a reorganization plan;

- Debtors waived any conflict that may arise due to Mr. Patton's service as FCR pursuant to the Prepetition FCR Agreement;

- Debtors had to provide a $250,000 retainer for Mr. Patton and his firm;
- Mr. Patton' service as FCR would terminate "immediately" upon the filing of a bankruptcy petition; and

- If bankruptcy was filed, Debtors anticipated it would ask the Court to appoint Mr. Patton as FCR.[11]

Mr. Patton retained his firm, Young Conaway Stargatt & Taylor, LLP ("YCST"), as legal counsel to the FCR.[12]

### Mr. Patton could only name one instance in the last 20 cases as FCR where he disagreed with the current claimants' committee.

Between September 2018 and the Petition Date, Mr. Patton and Young Conaway attended multiple meetings with the Debtors.[13]  Prior to the Petition Date, Debtors paid a total of $730,845 to both Mr. Patton and his firm.  As a condition of his retention, Mr. Patton agreed to keep confidential his prepetition engagement and the communications with the Debtors made during it.[14]

On February 27, 2019, the Debtors filed the Motion to Appoint James Patton as Future Claimants' Representative, along with Mr. Patton's declaration.[15]  Mr. Patton disclosed in his Declaration that he currently serves as FCR for future asbestos claimants in four cases[16] which

---

[11]  *See generally*, Appendix at APP00000130, Prepetition FCR Agreement.
[12]  *See generally*, Appendix at APP0000083 Debtors' Motion to Appoint James Patton, at ¶ 10.
[13]  *See generally*, Appendix at APP0000086, Debtors' Motion to Appoint James Patton, at ¶ 16.
[14] *See* Appendix, at APP00000134, Dkt. 100, Ex. C, Proposed FCR Agreement at ¶ 9.
[15]  *See* Appendix at APP00000100, Dkt. 100-3, "Patton Declaration."
[16]  *Id.* at ¶ 3.

he later supplemented to include his appointment in a fifth case, *In re Maremont Corporation*, No. 19-10118 (KJC) [D.I. 146]. In addition, Mr. Patton identified over twenty matters in which YCST previously represented the FCR in asbestos cases[17]; the five pending cases in which YCST currently represents the FCR (since increased to six with the addition of the *Maremont* case)[18]; and several matters in which YCST represents the FCR in connection with asbestos settlement trusts.[19] The Office of the U.S. Trustee pointed out that these cases were notable for the absence of anti-fraud protections and of safeguards against mismanagement and inflated professional fees built into the trusts.[20]

At the April 26, 2019, Hearing at which Mr. Patton testified, he could list only one instance in over 30 bankruptcy cases on which he either was FCR or represented the FCR where the FCR had diverged from the Current Tort Claimants on any issue:

> MR. PATTON: Sitting here today, [the *Babcock* bankruptcy is] the only specific context where you could find two pleadings that say opposite things filed by an FCR and a committee.[21]

On April 10, 2019, the U.S. Trustee attempted to propose a process for reviewing other candidates for the FCR position.[22] The Appellants joined in asking that other candidates be

---

[17]  *Id.* at ¶ 4(a).

[18]  *Id.* at ¶ 4(b).

[19]  *Id.* at ¶ 4(b), (c).

[20]  Appendix at APP0000220, Objection of United States Trustee (Dkt. 348) to Debtors' Motion to Appoint James Patton as Future Claimants' Representative, at 5.

[21]  *See* Appendix at APP00000435, Dkt. 464, Tr. of Hearing before Judge Silverstein, at 130:18–20.

[22]  Appendix at APP00000216, Dkt. 348, Motion to Appoint Legal Representative for Future Talc Claimants.

considered.[23]  On April 26, 2019, this request was rebuffed by the Court due to lack of time.[24]

Hence, no other candidates were considered other than the one picked by the Debtors.

### *Mr. Patton's firm, Young Conaway, represents Continental Insurance and other Certain Excess Insurers in substantially related matters.*[25]

Debtors assert that Certain Excess Insurers provide coverage to Debtors and Cyprus

including the Appellants.  The insurance policies are described as "Cyprus Historical Policies" in

Debtors First-Day Declaration.[26]

Young Conaway, Mr. Patton's law firm, currently represents insurers, including

Continental Insurance Company ("Continental"), National Union Fire Insurance Company of

Pittsburgh, PA ("National Union"), and Lexington Insurance Company ("Lexington"), among

others of the Appellants, in coverage matters that are substantially related to the issues in this

case, has advocated positions adverse to interests Mr. Patton has taken on for Imerys, and is

party to confidential and privileged information about these issues.  When Mr. Patton and Young

Conaway commenced their representation of Future Claimants in September 2018, Mr. Patton

---

[23] Appendix at 0000312, Dkt. 464, Tr. of April 26, 2019 Hr'g (Debtors: "First of all, Jim Patton is the only candidate before the court for future's rep; that's number one. . . . They've had an opportunity -- the U.S. Trustee has had an opportunity to propose additional candidates. We were prepared to interview those candidates. And we are ready to go today fully on our motion.").

[24] Appendix at APP00000480, Dkt. 464, Tr. of April 26, 2019 Hearing Before Judge Silverstein at 175: 16-25 to 176: 1-21; Appendix at APP00000519, Dkt. 503, Bench Ruling of Judge Silverstein, at 5.

[25] Young Conaway has represented Continental Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., and Lexington Insurance Company since 2014 in the *Warren Pumps* matter.  *See* Appendix at APP00000554, Declaration of Mark Muth in Support of Cyprus Historical Excess Insurers Objection to Debtors' Proposed Order Appointing James L. Patton as Future Claimant's Representative.

[26] *See* Appendix at APP000001, "Picard Declaration", Dkt. 10.

15

and his firm became "directly adverse" to Continental and the other Appellants they represented, who are current clients of the Young Conaway firm.[27]

In the *Warren Pumps* case, for which Young Conaway represents Appellants Continental, National Union and Lexington, among others, the issues include disputes over rights to coverage for asbestos claims.[28] There, as here, (i) more than one corporate entity asserts a claim to insurance policy proceeds, (ii) insurers are litigating contribution rights among insurers, (iii) there are issues raised regarding whether excess policies owe defense obligations and to whom and under what limitations and conditions, and (iv) the parties dispute exhaustion of underlying insurance policies, among other issues.[29]

Claims administrators signed a letter in September of 2014 on behalf of Continental, National Union, and Lexington Insurance to retain Young Conaway in the *Warren Pumps* matter. The waiver provision that the Bankruptcy Court reviewed provided the following:

---

[27] *See* Appendix at APP00000406, Dkt. 464, Transcript of April 26, 2019 Hearing at Ex. B, at 101: 21-24 (Mr. Schiavoni: ". . . Did you obtain a waiver from National Union Fire Insurance Company?" Mr. Patton: "I believe the answer is yes, too, it was an active litigation. Yes. . . . Mr. Schiavoni: And you have one also from Continental Casualty? Mr. Patton: I believe we do."); Appendix at APP00000143, Dkt. 101, Declaration of Edwin Harron ("Harron Declaration"), attached as Ex. A to Debtors' Motion to Employ Young Conaway as [Mr. Patton's] Attorneys at ¶12; *see also* Appendix at APP00000106, Dkt. 100, Declaration of James Patton ("Patton Declaration"), attached as Ex. B to Debtors Motion to Appoint James Patton as FCR at ¶13 ("Additionally, Young Conaway represents . . . National Union Fire Insurance Company of Pittsburgh, Pa. . . . in insurance coverage disputes that relate to environmental liabilities including asbestos claims but unrelated to talc claims or the Debtors."). While Continental Insurance Company and Lexington Insurance Company were not listed in Mr. Patton's Declaration, Young Conaway did obtain a waiver from both in order to represent them in the *Warren Pumps* action. *See* Waiver Letter Reviewed *In Camera* (*See* Appendix at APP00000572).

[28] *See* Appendix at APP00000538, Complaint of Warren Pumps, *Warren Pumps v. Century Indemnity Co.*, Consol. C.A. No. N10C-06-141 PRW [CCLD] (Sup. Ct. Del., June 15, 2010) ("*Warren Pumps* Complaint").

[29] Appendix at APP00000538, Dkt. 572-6, *Warren Pumps* Complaint.

As You are aware, the Firm has a substantial corporate workout, bankruptcy and insolvency practice. Accordingly, You agree that the Firm may represent other clients (i) in workout, bankruptcy and insolvency proceedings, and (ii) in connection with trusts established pursuant to section 524(g) of the Bankruptcy Code (collectively (i) and (ii) are referred to below as the "Bankruptcy Related Matters"). This is so provided that: (i) the Firm is not then representing and has not previously represented You in the same matter or a matter substantially related to the same matter, and (ii) the representation of the other client is in accordance with the applicable ethical and professional rules governing the conduct of lawyers ("Rules of Professional Conduct"). For example, You may be a creditor in Bankruptcy Related Matters in which the Firm is representing the Debtor or another creditor. The Client agrees that it will not assert that this instant Engagement is a basis for disqualifying the Firm from representing others in future matters in which the Firm is retained to represent a party in Bankruptcy Related Matters. The Parties agree, however, that the Firm will not represent plaintiffs in bankruptcy adversary proceedings involving claims for bad faith or extra-contractual coverage against You or Your affiliates. In other circumstances, You agree to promptly evaluate requests for waiver of any future potential conflicts. ***Further, You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for You in this matter, even if the interests of such clients in those other matters are directly adverse to You.*** We agree, however, that Your consent to the potentially conflicting representations described in the preceding sentence shall apply to Bankruptcy Related Matters only.[30]

### *Mr. Patton and Young Conaway agreed with Imerys to keep its prepetition retention a secret, preventing their clients from giving informed consent for a waiver.*

Mr. Patton's FCR agreement with Debtors ("FCR Retention Letter"), signed on

September 25, 2018, prohibited Mr. Patton or Young Conaway from disclosing their retention by

the Debtors' pre-petition—or their work in contemplation of bankruptcy—to Continental or any

---

[30] *See* Appendix at APP00000529, Dkt. 527, Supplemental Declaration of Patton at ¶7; Appendix at APP00000561, Dkt. 636, Letter Decision from Judge Silverstein on FCR Retention discussing *in camera* review of Young Conaway retention letter; *see also* Appendix at APP00000533, Dkt. 554, Second Supplemental Declaration of Patton, at ¶5.

17

of YCST's other insurer clients.[31]  In that FCR Retention Letter, Mr. Patton and Young Conaway

agreed that:

> I, YCST [Young Conaway], and any additional professionals retained by me to
> perform the services described herein agree that, except as otherwise required by
> law, court order or process, or the terms of this engagement letter, they will not
> disclose the existence or terms of this agreement to any person, and ***shall treat all
> information*** concerning the Company and its affiliates not otherwise publicly
> available, ***including information concerning the possibility that the Company
> may file for bankruptcy relief***, any potential terms for any plan of reorganization
> and any other information provided to them, ***as confidential*** (collectively,
> "Confidential Information")…[32]

Thus, James Patton and Young Conaway faced a Catch-22: neither could have disclosed

Debtors' potential bankruptcy, the planned adversary proceeding, or their retention as FCR to

Continental, National Union, Lexington, or other Certain Excess Insurers without violating their

agreement with Debtors to keep the retention a secret.  While claims administrators on behalf of

Continental and other Certain Excess Insurers represented by YCST provided a prospective

waiver in 2014, this general waiver was insufficient to provide informed consent on such

substantially related matters.

### Young Conaway's solicitation and representation of current talc claimants.

During Mr. Patton's testimony on April 26, 2019, Mr. Patton admitted that his firm was,

until April 30, 2019, soliciting current talc-related personal-injury claimants.[33]  At that time, his

---

[31]  *See* Appendix, at APP00000134, Dkt. 100, Ex. C, Proposed FCR Agreement at ¶ 9.

[32]  *See id.*

[33]  *See* Appendix at APP00000409- APP00000410, Dkt. 464, Tr. of April 26, 2019 Hr'ng at
104:4-17-105:12-15 ("SCHIAVONI:  Mr. Patton, can you tell us what this is?  PATTON:  It
appears to be something from our website.  SCHIAVONI:  Is this currently on your website?
PATTON:  I'll take your word for it. . . .  The date suggests you printed it out today. . . .
SCHIAVONI:  Can you tell us anything about, have you had any discussions with Ms. Walsh
or Mr. [sic] Wolf about their talc solicitations?  PATTON:  No.").

firm's website stated that they represented talc claimants.[34]  Mr. Patton reviewed a printout of

YCST's firm's web site soliciting tort claimants with talc-related injuries arising out of Johnson

& Johnson talc.[35]  Current claimants possess interests that are directly adverse to future claimants

given that the two different groups are each independently vying for the same finite resource:

insurance proceeds.

       While the Court ordered Mr. Patton to submit a supplemental declaration describing

whether YCST was currently representing current talc claimants, Mr. Patton did not disclose

whether it represented those clients in the past.  The Court's concerns were well-founded, but not

investigated:

> THE COURT:  First, at the hearing, a page from the YCST website was
> introduced into evidence as Certain Excess Insurers Exhibit 1.  This page of the
> website invited persons who believe they may have contracted ovarian cancer
> from talcum powder to contact the firm.  The webpage specifically references
> personal hygiene products manufactured by Johnson & Johnson, Debtors'
> customer.[36]

       Young Conway's response to the Court's concern was simply this: "Neither Young

Conaway nor I represent any clients who are asserting claims based on exposure to talc."[37]

There was no explanation for why the YCST web site stated the exact opposite only one month

---

[34]  *Id.*; Appendix at APP00000510, Certain Excess Insurers Exhibit 1, admitted into evidence at April 26, 2019 Hearing before Judge Silverstein.

[35]  Appendix at APP00000510, Certain Excess Insurers Exhibit 1, admitted into evidence at April 26, 2019 Hearing before Judge Silverstein.

[36]  Appendix at APP00000408- APP00000409, Dkt. 464, Tr. of April 26, 2019 Hearing Before Judge Silverstein at 103: 21-45 to 104: 1-8; Appendix at APP00000526, Dkt. 503, Bench Ruling of Judge Silverstein, at 12.

[37]  Appendix at APP00000529, Dkt. 527, Supplemental Declaration of James Patton, at ¶4.

before. The Bankruptcy Court's final decision accepted Mr. Patton's declaration without further

investigation or questioning, characterizing the statement as "definitive."[38]

***Certain Excess Insurers were prevented from
obtaining discovery on the production of
privileged, common-interest documents to the FCR.***

Mr. Patton disclosed that the Debtors gave Mr. Patton and his counsel access to a

"fulsome" data room full of documents about the tort claims.[39] On March 22, 2019, Certain

Excess Insurers, knowing that the FCR had current conflicts of interest, served discovery on

Debtors to determine what common-interest documents may have been turned over to the FCR.[40]

On April 5, 2019, Debtors objected to the requests and refused to provide any substantive

responses or documents.[41] Certain Excess Insurers moved to compel on April 19, 2019.[42] On

April 26, 2019, Certain Excess Insurers repeated in open Court their request for the insurer-

related documents that Debtors had produced to the Tort Claimants,[43] alerting the Court that

Debtors still refused to produce these documents to the insurers.[44] The Court denied the Motion

---

[38] Appendix at APP00000563, Dkt. 636, Letter Decision of Judge Silverstein, at 3.

[39] *See* Appendix at APP0000022, Dkt. 10, Picard Declaration, ¶ 47 (Debtors provided tort claimants with "access to a fulsome data room and responses to numerous information requests.").

[40] Appendix at APP00000285, Dkt. 394, Certain Excess Insurers' Motion to Compel.

[41] Appendix at APP00000296, Dkt. 438, Debtors Objections to Certain Excess Insurers' Discovery Requests.

[42] Appendix at APP00000285, Dkt. 394, Certain Excess Insurers' Motion to Compel.

[43] "Tort Claimants" refers to both the Official Committee of Tort Claimants ("TCC") and the Future Claimants' Representative ("FCR").

[44] *See* Appendix at APP00000329- APP00000330, Dkt. 464, Transcript of April 26, 2019 Court Hearing at 24:23–25, 25:2–11 (MR. SCHIAVONI: We asked whether [the FCR] had gotten documents that relate to the defense of claims, yes or no. . . . But if you listen to it, it's a legal representation. They're representing that they didn't do anything to violate their view of what the law is. . . . It's not a representation as to the facts. The facts here are did they turn over documents that contain the statements and opinions of counsel.").

to Compel on May 7 stating that Certain Excess Insurers should have gone to her directly to seek redress and the Motion to Compel was dilatory.[45]

The Court's preliminary decision on May 7, 2019 on Mr. Patton's retention relied significantly on the assumption that Debtors had not provided Certain Excess Insurers' privileged, common-interest material to the FCR,[46] misreading Debtors' responses to Certain Excess Insurers' discovery requests, which never denied that they had produced these privileged communications to the FCR.[47] Debtors admitted that on May 31, 2019, they disclosed to the FCR privileged documents about the underlying tort claims asserted against Debtors and Cyprus Mines.[48] Despite being clawed back on June 6, 2019, evidence shows that these privileged documents have been reviewed by the Tort Claimants.[49] As the same documents were provided

---

[45] *See* Appendix at APP00000515, "Bench Ruling", Dkt. 503, and "Order", Dkt. 649; Appendix at APP00000570, Dkt. 464, Tr. of April 26, 2019 Hearing Before Judge Silverstein at 24: 19-25 to 25: 1-22, 29: 1-16, 95:18-25 to 96: 1-3.

[46] Appendix at APP00000525, Dkt. 503, Bench Ruling of Judge Silverstein, at 11 (THE COURT: "But, in any event, in their responses to discovery, ***Debtors state that "only certain publicly available information, including case pleadings, that may be construed as containing statements by defense counsel were provide[d] to Mr. Patton or his counsel"*** . . . Debtors' counsel has further represented to me on numerous occasions that they have not shared any information which breaches their Confidentiality Agreement with Cyprus. . . Accordingly, to the extent that the sharing of information subject to a common interest (or other) privilege could create an issue, the evidence here is that such information was not shared.").

[47] Appendix at APP00000189, Debtors' Objections to Certain Excess Insurers Requests for Admission ("The Debtors ***admit only that certain publicly available information, including case pleadings, and non-privileged documents were provided to Mr. Patton and/or his counsel.***").

[48] *See* Appendix at APP00000296, Dkt. 833, Debtors' Objection to Cyprus Historical Excess Insurers' 2004 Motion ("Debtors' Objection"); Appendix at APP00000644, at Dkt. 852, Declaration of Matthew Lovell ("Lovell Decl.") at 1–4.

[49] *See* Appendix at APP00000578, APP00000602, APP00000646, "Gilbert LLP Fee Requests", Dkts. 811, 841, 957.

to the FCR, Young Conaway thus very likely possesses its insurer clients' privileged and

confidential information about these and other substantially related issues and their litigation.

## ARGUMENT

I.    **THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW BECAUSE WHILE THE BANKRUPTCY COURT ADOPTED THE GUARDIAN-AD-LITEM STANDARD, THE COURT DID NOT APPLY THAT STANDARD TO THE FCR'S RETENTION.**

Mr. Patton could not waive on behalf of as-yet non-existent claimants his (or his firm's)

concurrent conflicts of interest.  Put another way, unknown future claimants cannot give

informed consent to waive conflicts of interest.  This Court should review *de novo* this

misapplication of the legal standard, which is an error of law.[50]

The FCR had more than one current conflict of interest: his firm (i) represents several

Appellant Excess Insurers in substantially similar asbestos coverage litigation and (ii) had a

conflict of interest with future claimants because Young Conaway was soliciting—and indeed

stated on its website that it was currently representing—current talc claimants allegedly injured

by Johnson & Johnson's talc that Debtors supplied.  These conflicts existed for 8 months from

the time the FCR was first retained by the Debtors in September of 2018 until May 2019 and

continue today with regard to the Appellants who are clients of Mr. Patton's firm.  As to the first

conflict with the Certain Excess Insurers, a prospective waiver letter did not apply to the

substantially similar litigation here.  And indeed, the FCR could not waive either of these

conflicts.  Nor would these conflicts be permitted under either a fiduciary or "disinterested"

standard.

---

[50]    *In re Sharon Steel Corp.*, 871 F.2d 1217, 1223 (3d Cir. 1989) (appellate court "must exercise a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.").

22

**A.** **While the Bankruptcy Court correctly chose to evaluate the FCR's conflicts under the *guardian-ad-litem* test, it misapplied that standard here.**

After reviewing "the seminal cases in the field of asbestos bankruptcies," the Bankruptcy Court held that a fiduciary standard applied to evaluating the FCR's retention application.[51] From its reading of the cases, the Court below reasoned that:

> In his *Johns-Manville* opinion, Judge Lifland grants the motion to appoint a legal representative, schedules a hearing to consider the precise form and function of the legal representative and invites parties to make submissions. He notes the conflict of interest this legal representative will have with the committee, the debtor and the movant in that case and states "an independent representative for future claimants is essential." *In re Johns-Manville Corp.*, 36 B.R. at 749 n.3. He also suggests, without exclusion, three possible models on which to fashion the legal representative-a guardian ad litem, an amicus curiae, and an examiner.[52]

The Bankruptcy Court also cited the recent decision in *In re Fairbanks*, which also followed Judge Lifland's landmark holding in *Johns-Manville*, namely, that since future claimants are substantially similar to minors or incapacitated adults insofar as they are incapable of representing themselves, a future claimants' representative must perform "***fiduciary-like duties*** in his or her very special role of negotiating for individuals who will be required to participate in a claim-resolution procedure (the trust via the channeling injunction) ***that they had no say about***." *In re Fairbanks Co.*, 601 B.R. 831, 838 (Bankr. N.D. Ga. 2019). Since the individuals whom the FCR represents will have had no say about the claim-resolution procedure that will bind them, they need an advocate who is "zealous, objective, reasonable, fair, diligent, and loyal," rather than merely disinterested. *Id.*

---

[51] Appendix at APP00000521, Dkt. 503, Bench Ruling of Judge Silverstein at 7; *see In re Raytech Corp.*, 222 B.R. 19 (Bankr. D. Conn. 1998) (appointing a guardian ad litem to protect the interests of future claimants).

[52] *Id.*

There, the U.S. Trustee's and the court's concern was that of a "cottage industry" where "the FCR is part of a closed group and has an incentive to advocate (or to limit advocacy) so that the FCR remains in the group at the expense of future claimants." *Id.* at 841.[53]

The *guardian-ad-litem* standard is particularly timely as the United States Department of Justice and U.S. Trustees around the country are taking "unprecedented steps to combat a 'problematic lack of transparency in the operation and oversight of asbestos trusts.'"[54] These steps follow a November 2017 letter to the United States Attorney General by twenty state attorneys general describing problems with the asbestos trust system and requesting federal engagement to "ensure that no fraud is being committed."[55] The DOJ stated in *In re Kaiser Gypsum* that secrecy in trust filings has made it "nearly impossible to detect when plaintiffs are seeking recovery based on factual representations that may be incompatible with other representations previously made in other litigation or before other trusts."[56] Like the DOJ, Certain Excess Insurers seek to ensure that trust assets "are not dissipated through payments to

---

[53] In *Fairbanks*, where there were no actual conflicts of interest, the court approved Mr. Patton as FCR, after a detailed review of at least two FCR candidates. Appendix at APP00000693, Docket for *In re Fairbanks*. *See* Dkt. 33, Application to Employ Lawrence Fitzpatrick as Future Claimants' Representative, August 10, 2018 (withdrawn at Dkt. 115).

[54] Mark A. Behrens & William F. Northrip, Department of Justice Combats Asbestos Trust Abuse, 86 Def. Couns. J. 1, 1–2 (2019).

[55] *Id.* citing Statement of Interest on Behalf of the United States of America Regarding Plans of Reorganization for Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc., *In re Kaiser Gypsum Co., Inc.*, No 16-31602 (JCW), at 8 (Bankr. W.D.N.C. Sept 13, 2018), available at https://www.justice.gov/opa/press-release/file/1093916/download [hereinafter "DOJ Kaiser Gypsum Statement of Interest"].

[56] *Id.* at 6 citing DOJ Kaiser Gypsum Statement of Interest at 8.

persons making fraudulent claims or who otherwise would not have had viable claims if the debtor had remained in the tort system."[57]

To push for more transparency, U.S. Trustees have objected to the appointment of James Patton in *Fairbanks* and Lawrence Fitzpatrick in *In re Duro Dyne*, who together share the lion's share of these appointments around the country.[58] They have worked together for nearly twenty years, with Mr. Patton representing Mr. Fitzpatrick as FCR in some of the largest asbestos bankruptcies since 2000.[59] With the U.S. Trustee's arguments in mind, the *Fairbanks* court applied this higher standard for the appointment of an FCR, while approving Mr. Patton's retention. In this case, we have the actual conflicts of interest that "demonstrate a lack of independence or partiality" in addition to the other prepetition relationships that caused an appearance of impropriety in *Fairbanks*. *Id.* at 841.

---

[57] *Id.* at 10 citing DOJ Kaiser Gypsum Statement of Interest at 15.

[58] *Id.* at 1-2; *see* Objection of the United States Trustee to the Debtors' Motion for an Order Appointing Lawrence Fitzpatrick as Representative for Future Asbestos Claimants, *In re Duro Dyne Nat'l Corp.*, No 18-27963 (MBK) (Bankr. D. N.J. Oct. 1, 2018), available at https://www.justice.gov/opa/press-release/file/1096501/download [hereinafter "USTP Objection to Duro Dyne FCR Appointment"]; Notice of Appeal and Statement of Election, *In re Duro Dyne Nat'l Corp.*, No 18-27963 (MBK) (Bankr. D. N.J. Oct. 31, 2018); Amended Objection of the United States Trustee to Debtor's Motion for an Order Appointing James L. Patton, Jr., as Legal Representative for Future Asbestos Claimants, *In re The Fairbanks Co.*, No. 18-41768-PWB (Bankr. N.D. Ga. Dec. 14, 2018).

[59] *See Prepackaged Asbestos Bankruptcies: Down But Not Out*, New York University Annals of American Law, Vol. 63, Issue 4 (2008), by Eric Green, Lawrence Fitzpatrick, James Patton, Edwin Harron, and Travis Turner (Lawrence Fitzpatrick was sole trustee of the Fibreboard Settlement Trust and the Met-Coil Systems Corporation TCE PI Trust and served as FCR in (i) *In re ACandS, Inc.,* 311 B.R. 36, 41 (Bankr. D. Del. 2004); (ii) *In re Global Industrial Technologies, Inc.*, Case No. 02-21626 (Bankr. W.D. Pa. 2002); (iii) *In re North American Refractories Co.,* Case No. 02-20198 (Bankr. W.D. Pa. 2002); and (iv) *In re Pittsburgh Corning Corp.,* Case No. 00- 22876 (Bankr. W.D. Pa. 2000)."). James Patton and Edwin Harron represented Lawrence Fitzpatrick in his capacity as the FCR in *ACandS*, *Global Industrial Technologies*, *North American Refractories*, and *Pittsburgh Corning* bankruptcy cases.

As several studies have pointed out, future claimants have not fared well in asbestos trusts: "[A]lthough trusts are established on the promise to pay all current and future victims equitably, this promise has already been broken at all but a few trusts. The threat to future victims has become pressing given the dramatic growth of the bankruptcy trust system." S. Todd Brown, *How Long is Forever This Time? The Broken Promise of Bankruptcy Trusts*, 61 BUFF. L. REV. 537, 538-39 (2013).

> The bankruptcy trust system is long past the point where participants can look at the rapid depletion of newly established trusts as unanticipated and unintended consequences of generous compensation criteria. If we can be reasonably assured of anything, it is that a trust that employs the same criteria and follows the same practices as its predecessors is extremely unlikely to "value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner" as required by section 524(g).[60]

According to one more recent study, between 2008 and 2018, 60% of asbestos trusts were forced to reduce their "payment percentages," which is the mechanism that determines the actual payment that a claimant with a particular disease or settlement will receive.[61] For those trusts, an asbestos claim today is worth, on average, 46% less than it would have been worth a decade earlier.[62] This erosion of trust assets—which disproportionately prejudices future claimants—is the precise harm that the FCR was meant to prevent.

Far from providing the strong and independent voice that Congress intended, in many bankruptcy cases the FCRs have done little to challenge plans that unfairly favored present

---

[60]   S. Todd Brown, *How Long is Forever This Time? The Broken Promise of Bankruptcy Trusts*, 61 BUFF. L. REV. 537, 538-39 (2013).

[61]   *See* Peter Kelso and Marc Scarcella, *Dubious Distribution: Asbestos Bankruptcy Trust Assets and Compensation*, U.S. Chamber of Commerce, March 2018, at 9. *Available at:* https://www.instituteforlegalreform.com/research/dubious-distribution- asbestos-bankruptcy-trust-assets-and-compensation.

[62]   *Id.*

claimants and debtors at the expense of future claimants.[63]  Notably, in *ACandS*—a case in which YCST represented the FCR—the FCR not only failed to object to the plan provisions that the bankruptcy court criticized as unfair to future claimants (among other disfavored parties), but he even joined the debtors and the present claimants' committee in appealing the bankruptcy court's ruling.[64]

The need for a truly independent and effective FCR is especially pertinent in light of recent court findings of impropriety in the asbestos claims process.[65]  Because future claimants are the parties who will be most directly harmed by payment of fraudulent or invalid present claims, the FCR should play a leading role in investigating present claims and in ensuring that the plan contains sufficient safeguards to ensure that only meritorious claims will be paid and that professional fees and costs will be controlled.  But it is difficult to imagine how this function can be performed by an FCR who is subject to conflicts of interest and divided loyalties, particularly where those conflicts involve the very same law firms he should be investigating or against whom he should be negotiating.

From this perspective, there is little question that the practice of appointing debtor-selected FCRs with close associations to the lawyers for the current claimants has not resulted in the vigorous oversight that Congress intended.  For example, although the specific details vary from case to case, the majority of section 524(g) trusts have included provisions that: (i) lack

---

[63]  *See, e.g., In re ACandS, Inc.,* 311 B.R. 36, 43 (Bankr. D. Del. 2004) (denying, as fundamentally unfair, approval of pre-packaged asbestos plan whose terms reflected "unbridled dominance" of certain present claimants' attorneys whose clients were paid in full at the expense of other creditors, including future claimants).

[64]  *See ACandS Inc. v. Travelers Casualty*, No. 04-cv-00123-JJF (D. Del.).

[65]  *See In re Garlock Sealing Technologies, LLC*, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014) (finding "startling pattern of misrepresentation" in sample of asbestos claims).

transparency in the filing and payment of trust claims; (ii) obligate trusts to resist discovery; and (iii) otherwise prevent any effective outside oversight over whether only legitimate claims are being paid.[66] As *Garlock* demonstrates, the lack of transparency has allowed the asbestos claims process to become "infected with . . . impropriety."[67] Even though the future victims represented by the FCR would be among the most immediate victims of any fraud or mismanagement, there

---

[66] *See* Dixon, McGovern, and Coombe, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts,* RAND Institute for Civil Justice, 2010 at xvii (noting lack of publicly available information about trust payments); Marc C. Scarcella & Peter R. Kelso, *Asbestos Bankruptcy Trusts: A 2013 Overview of Trust Assets, Compensation & Governance*, 12:11 MEALEY ASBESTOS BANKR. REP. 9 (June 2013) (discussing expanded non-disclosure language added to many trusts after 2006 and noting that such provisions "raise questions about the overall lack of transparency and external oversight of trust operations").

The foregoing provisions have consistently appeared, with very little variation, as part of the trust distribution procedures in many of the cases in which Patton has served as the FCR or YCST has served as counsel to the FCR. *See, e.g.,* Leslie Controls, Inc. Form of Asbestos Personal Injury Trust Distribution Procedures at ¶ 6.6, available at http://leslie.mfrclaims.com/Resources/Leslie_Controls_-_amended_TDP.pdf ("All submissions to the Asbestos PI Trust by a holder of an Asbestos Personal Injury Claim, including the proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos PI Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions"); Yarway Asbestos Personal Injury Trust Distribution Procedures at ¶ 6.5, available at http://www.yarwaytrust.com/wp-content/uploads/2018/04/565d1d617259e5027803393b9302f2f3.pdf) (same); First Amended United Gilsonite Laboratories Asbestos Personal Injury Trust Distribution Procedures at ¶ 6.6, available at http://www.ugltrust.com/documents/tdp.pdf (same); Metex Asbestos PI Trust Distribution Procedures in Connection With Metex Asbestos PI Trust Agreement at ¶ 6.6, available at http://metex.mfrclaims.com/Resources/METEX%20API%20TRUST_TDP.PDF (same); Form of Specialty Products Holding Corp. Asbestos Personal Injury Trust Distribution Procedures at ¶ 6.6 (same); ACandS, Inc. Asbestos Settlement Trust Distribution Procedures at ¶ 6.5 (same), *available at* http://www.acandsasbestostrust.com/wp-content/uploads/2018/05/9644f5811bba6744a445e5dd78fae97c.pdf.

[67] 504 B.R. at 73.

have been virtually no reported instances of an FCR objecting to such provisions or demanding greater transparency in the claims process.

**B.    The FCR never revealed its actual,
         concurrent conflicts until the retention hearing.**

While Young Conaway represented the future claimants, Young Conaway also represented the Certain Excess Insurers in substantially similar mass tort litigation.  And while Young Conaway was soliciting and indeed stated on its web site that it was representing current talc tort claimants, it was representing the same future talc claimants for 8 months.  As to the first conflict, neither Young Conaway nor Imerys notified Certain Excess Insurers about the potential FCR engagement, that Imerys had shared privileged documents with Young Conaway about Certain Excess Insurers' insurance strategies, or that Imerys was planning a bankruptcy filing.[68] Without that basic information, Certain Excess Insurers could not have given knowing consent. And as for the second conflict, we know nothing about it because we were not given an opportunity to investigate it.

Only with "informed consent, confirmed in writing" that "clearly identif[ies] the client or clients" after "consult[ing] with the clients" may a law firm have such a concurrent conflict.  Del. RPC 1.7(b)(4); *see* Cmt. 2 to Rule 1.7.  Indeed, Young Conaway and Mr. Patton did not and could not identify the conflict here because they expressly agreed with Imerys to keep their retention by Imerys confidential.[69]  At the very least, Young Conaway and Mr. Patton should

---

[68]    In circumstances we have here where a "lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent.'"  Del. RPC 1.7, Cmt. 19 (emphasis added).

[69]    *See supra* n. 2, FCR Retention Letter ("I, YCST [Young Conaway], and any additional professionals retained by me . . . agree that, except as otherwise required by law, court order

have alerted Certain Excess Insurers to this conflict on September 25, 2018—as soon as the conflict arose.

In *In re eToys, Inc*., 331 B.R. 176, 194 (Bankr. D. Del. 2005), the court compelled a law firm to disgorge its fees where the law firm represented a creditor in separate litigation, and thus "its representation of the Debtors against [the creditor] in this case constituted an actual conflict of interest, in the absence of a conflict waiver executed by the parties *after full disclosure*."[70] Here, there was also no full disclosure of the conflict—only a general, prospective waiver from 5 years before that did not apply to "substantially related" matters as these matters are here.

If that one conflict were not enough, until the April 26, 2019 hearing, James Patton, already functioning as an FCR for 8 months, had not disclosed that his firm was soliciting and indeed representing current talc tort claimants. Young Conaway's web site stated on April 26, 2019 that "[a]t Young Conaway Stargatt & Taylor, LLP, ***our injury lawyers work with people across Delaware and beyond who have been harmed by all types of dangerous and defective products, <u>including talcum powder</u>.***"[71] While Young Conaway subsequently took down the web site on April 30, 2019, and declared two weeks later that it did not "represent any clients who are asserting claims based on exposure to talc," no further explanation was given or

---

or process, or the terms of this engagement letter, they will not disclose the existence or terms of this agreement to any person, and shall treat all information concerning the Company and its affiliates not otherwise publicly available, including information concerning the possibility that the Company may file for bankruptcy relief. . . as confidential.").

[70] *In re eToys*, 331 B.R. at 194.
[71] Appendix at APP0000510, Dkt. 464, Certain Excess Insurers' Exhibit 1 admitted into evidence at April 26, 2019 Hearing before Judge Silverstein.

investigated as to why YCST's web site asserted the exact opposite statement just a month before.[72]  Yet this was going on for 8 months while Patton was functioning as the FCR.

Neither the FCR nor anyone else offered any further explanation about this eyebrow-raising conflict.  Nor did the Court allow investigation into Young Conaway's efforts to solicit and, indeed, stated representation of current claimants up to and including the hearing date to approve Mr. Patton as FCR.  That was in error.

Unknown Future Claimants cannot give informed consent to waive conflicts of interest. The Third Circuit held as much in *In re Congoleum*, where a law firm co-counseled with plaintiffs' law firms on current tort claims, and indeed represented current tort claimants "on insurance matters," while also functioning as insurance counsel to the Debtors to negotiate a plan with those very same plaintiffs' counsel.[73]  There, a prospective waiver obtained by the firm was ineffective because the law firm did not obtain ***individual*** waivers from each tort claimant, instead obtaining a prospective waiver from the co-counsel's firm.[74]  The Third Circuit has thus already held that individual claimants must be given the individual opportunity to waive any conflict, which unknown future claimants simply cannot do.[75]  Much like the law firm in *Congoleum* was disqualified after failing to obtain waivers from each current tort claimant, Mr. Patton could not obtain waivers from future claimants that do not yet exist.  And Mr. Patton did not and could not waive the conflict with Certain Excess Insurers on behalf of the future claimants.

---

[72]  Appendix at APP00000529, Dkt. 527, Supplemental Declaration of James Patton at ¶4.
[73]  *In re Congoleum Corp.*, 426 F.3d 675, 681 (3d Cir. 2005).
[74]  *Id.*
[75]  *Id.*

**C. Even under the disinterested standard, the FCR should not have been approved here because that rule *per se* prohibits concurrent conflicts of interest.**

"Conflict of interest rules are more strictly applied in the bankruptcy context than in other areas of the law, at least insofar as they relate to professionals retained by the estate." 1 *Collier on Bankruptcy*, § 8.03[1] (15th ed. 2002).[76] In bankruptcy, an actual conflict of interest is *per se* disqualifying. *See In re Pillowtex*, 304 F.3d 246, 251 (3d Cir. 2002). Fiduciaries cannot waive a potential conflict of interest. *See In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 334 (E.D. Pa.1982) ("professionals engaged in the conduct of a bankruptcy case should be free of the ***slightest*** personal interest which ***might*** be reflected in their decisions concerning matters of the debtors' estates, or which ***might*** impair the high degree of impartiality and detached judgment expected of them") (emphasis added); *In re Glenn Elec. Sales Corp.*, 89 B.R. 410, 423 (Bankr. D.N.J.), *aff'd*, 99 B.R. 596 (D.N.J. 1988) quoting 2 Collier on Bankruptcy, ¶ 327.03 ("professional persons employed by the trustee should be free of any conflicting interest which might in the view of the trustee or the bankruptcy court affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them.").[77] The bankruptcy court must determine whether any competing interest of a court-appointed professional "created either a meaningful incentive to act contrary to the best interests

---

[76] The Model Rules of Professional Conduct of the American Bar Association (the "Model Rules") govern the practice of law before this Court. Del. Bankr. L.R. 1001−1(b) (adopting the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware); D. Del. L.R. 83.6(d) (incorporating the Model Rules).

[77] *See In re Perry*, 194 B.R. 875, 880 (E.D. Cal. 1996) ("[T]he bankruptcy code does not permit [the bankruptcy trustee] to negate that conflict by signing a waiver .... because the ultimate party at interest is the creditors of the bankruptcy estate."); *In re Wheatfield Business Park LLC*, 286 B.R. 412 (C.D. Cal. 2002) (holding that conflict waiver from debtors and U.S. Trustee was insufficient to waive conflict of interest, and notice to creditors and their approval was necessary for valid consent).

of the estate and its sundry creditors—an incentive sufficient to place those parties at more than acceptable risk—or the reasonable perception of one." *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir.1994) *citing In re Martin*, 817 F.2d 175, 180 (1st Cir.1987). "[D]oubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification." *In re Meridian Auto. Sys.-Composite Operations, Inc.*, 340 B.R. 740, 750 (Bankr. D. Del. 2006).

Courts around the country refuse to allow concurrent conflicts of interest under the "disinterestedness" standard, let alone under the higher *guardian-ad-litem* standard that was held to apply here. Indeed, the Third Circuit holds that under Section 327(a), the "disinterested" standard "presents a per se bar to the appointment of a law firm with an ***actual*** conflict, and gives the district court wide discretion in deciding whether to approve the appointment of a law firm with a ***potential*** conflict." *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998); *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005). Other courts in the Third Circuit and around the country are in accord:

- *In re Congoleum Corp.*, 426 F.3d 675 (3d Cir. 2005) (disqualifying law firm pursuant to "disinterested" standard because the firm, retained post-petition as "special insurance counsel," had an actual, concurrent conflict of interest under both the New Jersey Rules of Professional Conduct and the Bankruptcy Code, where firm had represented debtor prepetition in negotiating settlement arrangements with asbestos injury claimants represented by attorneys who were co-counsel with firm in insurance matters for those same claimants);

- *In re First Jersey Sec., Inc.*, 180 F.3d 504 (3d Cir. 1999) (debtor's transfer of restricted securities to firm, in payment of debt for legal services, was not made in ordinary course of business, and, thus, payment was a preference, creating an actual conflict of interest disqualifying firm as counsel for debtor.);

- *In re Fleming Cos.*, 305 B.R. 389, 393 (Bankr. D. Del. 2004) (denying application for retention as Debtors' advisor and holding that "[S]ection 327(a) imposes a per se disqualification on any professional who has an actual conflict of interest," where advisor's receipt of an apparent preference from debtors created an actual conflict of interest);

- *In re The Harris Agency, LLC*, 462 B.R. 514, 522 (E.D. Pa. 2011) (law firm had actual conflict of interest requiring its disqualification from representation of Chapter 11 debtor-limited liability company as of the date on which it entered its appearance as counsel for another, related LLC, which had lent money to debtor prepetition, and holding that "[a]lthough a court may initially authorize the employment of counsel, it must disqualify counsel upon learning of an actual conflict, and it may exercise its discretion to remove counsel if there is a potential conflict.");

- *In re Keeley & Grabanski Land P'ship*, No. BR 10-31482, 2013 WL 2384100, at *4 (Bankr. D.N.D. May 30, 2013) (disqualifying attorney that represented debtor and principal of debtors because attorney "would be representing parties with plainly adverse positions and would be forced to abandon his fiduciary obligation to one or the other or both.");

- *American Printers and Lithographers, Inc.*, 148 B.R. 862 (Bankr. N.D. Ill. 1992) (denying retention of attorneys that Chapter 11 debtor sought to employ who worked for a firm that had a continuing relationship, unrelated to the bankruptcy case, with a bank which was a major secured creditor of the debtor);

- *Matter of Status Game Corp.*, 102 B.R. 19, 21–22 (Bankr. D. Conn. 1989) (Court denied authority for Chapter 11 debtor to retain prepetition counsel because of counsel's past and current representation of debtor's principal secured lender.);

- *In re Diamond Mortg. Corp. of Illinois*, 135 B.R. 78, 90 (Bankr. N.D. Ill. 1990) (denying majority of fees to professional with undisclosed conflicts of interest and holding that "[i]t is universally recognized that attorneys are prohibited from representing actual conflicts of interest in bankruptcy.").

The tests of disinterestedness for estate professionals are to be rigidly applied and "could not be waived because of the integrity or ability of the particular person involved." *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 333 (E.D. Pa. 1982). Delaware bankruptcy courts do not permit waiving concurrent conflicts of interest. *In re eToys, Inc.*, 331 B.R. 176, 194 (Bankr. D. Del. 2005) (where law firm represented a creditor in separate litigation, and thus "its representation of the Debtors against [the creditor] in this case constituted an actual conflict of interest, in the absence of a conflict waiver executed by the parties after full disclosure," law firm should have been disqualified and was compelled to disgorge all fees); *see In re B.E.S. Concrete*

*Prod., Inc*., 93 B.R. 228, 235 (Bankr. E.D. Cal. 1988) ("Although the parties can waive the

conflict upon appropriate disclosures, the waiver is more difficult to obtain in a chapter 11 case

because the debtor in possession stands in a fiduciary capacity that constrains its ability to make

such a waiver."); *In re Perry*, 194 B.R. 875, 879-80 (E.D. Cal. 1996) (holding that law firm

could not represent Chapter 7 trustee and a potential purchaser of estate assets, holding that

"[i]nformed consent could not be obtained because . . . 'the real parties in interest in this case are

the creditors, and that is not a waivable conflict.'").[78]

     Like the Bankruptcy Code, the Rules of Professional Conduct prohibit waiving current

conflicts.  RPC 1.7(a)(1) applied whenever an attorney represents two clients with adverse

interests at the same time "*even where the matters are wholly unrelated*."  ABA Model Rules

1.7, Cmt. 6 (5th Ed. 2003) (emphasis added); Cmt. 6 to Rule 1.7.  *See Tran v. Meyers,* No. 95-

2587, 1995 WL 584374, at *4 (E.D. Pa. Oct. 2, 1995) (commenting on Pennsylvania corollary of

RPC 1.7).  Rule 1.7(a) forbids a lawyer from representing a client if that representation will be

"directly adverse" to another client or "there is a significant risk that the representation of one or

more clients will be materially limited by the lawyer's responsibilities to another client, a former

client or a third person or by a personal interest of the lawyer."[79]  To establish an ethical

violation under RPC 1.7(a)(1), "one does not have to prove prejudicial impact, negative result, or

an exchange of confidential information. . . .  It is the interests of the client with which the rule is

---

[78]   Certain conflicts that a client could waive after full disclosure outside of the bankruptcy
context, such as simultaneous representation of the client and client's creditor, are prohibited
by the Bankruptcy Code itself from being waived.  *In re Diamond Mortg. Corp. of Illinois*,
135 B.R. 78, 90 (Bankr. N.D. Ill. 1990); *see In re Kendavis Indus. Int'l, Inc*., 91 B.R. 742
(Bankr. N.D. Tex. 1988); *In re Lee*, 94 B.R. 172 (Bankr. C.D. Cal. 1988).

[79]   Del. RPC 1.7(a)(1)-(2) is grounded in the notion that an attorney must provide complete and
undivided loyalty to the client.

concerned, not the result obtained." *In re Cendant Corp. Sec. Litig.*, 124 F. Supp. 2d 235, 243 (D.N.J. 2000) (internal quotations omitted).

Here, Mr. Patton's firm was soliciting to represent current talc claimants in cases alleging injury from talc that Debtors distributed, a fact that he did not voluntarily disclose and only admitted on cross-examination. Moreover, his firm represents several Appellant Excess Insurers in substantially similar asbestos coverage litigation. Under the alternative "disinterested" conflict of interest standard—that should be strictly applied in bankruptcy—Mr. Patton should not have been approved here.

## II. THE BANKRUPTCY COURT ERRED BY APPOINTING MR. PATTON AND HIS FIRM IN LIGHT OF THE CONFLICTS OF INTEREST WITH CERTAIN EXCESS INSURERS.

The Bankruptcy Court erred in authorizing the retention of Mr. Patton and his firm in the face of Young Conaway's concurrent representation of Certain Excess Insurers in a "substantially related," ongoing matter. This concurrent conflict of interest disqualifies Mr. Patton. This is true under both Bankruptcy Code Section 327 and the rules of professional conduct.

According to the Third Circuit in *In re Marvel*, Section 327(a) "presents a per se bar to the appointment of a law firm with an ***actual*** conflict, and gives the district court wide discretion in deciding whether to approve the appointment of a law firm with a ***potential*** conflict." *In re Marvel Entm't Grp., Inc*., 140 F.3d 463, 477 (3d Cir. 1998). Here, Certain Excess Insurers were never given the opportunity to waive with full disclosure of the conflicts here. At most, there was only a limited, prospective waiver from 5 years before that does not apply to "substantially related" matters, as the case is here.

36

### A. The Bankruptcy Court abused its discretion by holding that the concurrent conflict of interest with Certain Excess Insurers could be waived through a prospective, open-ended waiver.

The Court below erred by approving a prospective waiver, absent full disclosure beforehand, despite acknowledging that the waiver in question was "somewhat open-ended," and was signed in connection with a matter pre-dating this case by five years.[80] The effectiveness of an advance waiver is governed by Rule 1.7(b). According to the Committee Comments to Rule 1.7, "advance consent cannot be effective if the circumstances that materialize in the future are such as would make the conflict non-consentable." *Id.* at Cmt. 22. The effectiveness of an advance waiver under Delaware law is "generally determined by the extent to which the client reasonably understands the material risks that the waiver entails," which in turn, depends on the comprehensiveness of the "explanation of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations." *Id.*

Similarly, the Third Circuit has held that "the effect of a waiver, particularly a prospective waiver, depends upon whether the clients have given truly informed consent." *In re Congoleum Corp.*, 426 F.3d 675, 691 (3d Cir. 2005). In *Congoleum*, prospective waivers could not legitimize concurrent conflicts because the disqualified law firm did not contact the claimants about the conflict, instead relying on the claimants' counsel to approve the waiver. *In re Congoleum Corp.*, 426 F.3d 675, 690 (3d Cir. 2005). "If the consent is general and open-ended, then the consent ordinarily will be ineffective because it is not reasonably likely that the client will have understood the material risks involved." *In re Meridian Auto. Sys.-Composite Operations, Inc.*, 340 B.R. 740, 748 (Bankr. D. Del. 2006) (quoting Model R. Prof'l Conduct

---

[80] *See* Appendix at APP00000568- APP00000569, Letter Ruling dated May 31, 2019, Case No. 19-10289-LSS at 8-9.

1.7, cmt. [22] when disqualifying counsel based on inadequate disclosure of conflict). "A prospective waiver should identify the potential opposing party, the nature of the likely subject matter in dispute, and permit the client to appreciate the potential effect of the waiver." *Elonix I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 583 (D. Del. 2001) (finding prospective waiver was sufficient because it notified client of specific potential conflicts); *In re IH 1, Inc.*, 441 B.R. 742, 748 (Bankr. D. Del. 2011) (disqualifying counsel from representing parties that were not identified in a prospective waiver).

The Court below found the waiver was effective by holding that "[g]iven the waiver . . . it is difficult to see how these issues are not encompassed in the waiver even if 'substantially related.'"[81] But this bankruptcy and *Warren Pumps* involve many of the same legal issues. In both matters, there are questions about (i) excess policies' defense obligations; (ii) exhaustion of underlying insurance policies; (iv) allocating indemnity and defense payments among the insurance policies; and (iv) which successor corporate entity is entitled to policy proceeds to pay long-tail claims.[82] Young Conaway's five-year-long representation of Certain Excess Insurers in the *Warren Pumps* give it insight into Certain Excess Insurers' strategies on all of these issues.

The waiver clause here expressly excluded such substantially related matters as exist between this bankruptcy and Warren Pumps:

> Further, You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter ***that is not substantially related*** to our work for You in this matter, even if the interests of such clients in those other matters are directly adverse to You.[83]

---

[81]  *See* Appendix at APP00000566, Dkt. 636, Order of Judge Silverstein at 6.

[82]  Appendix00000538, Dkt. 572-6, *Warren Pumps* Complaint.

[83]  Appendix at APP00000533, Dkt. 554, Second Supplemental Declaration of Patton, at ¶5.

The Bankruptcy Court reasoned that "these general issues could arise in every mass tort case and thus would eviscerate the very waiver given."[84]  First, even if that were true, that would simply mean that the waiver did not extend to mass tort cases.  There are a myriad other potential cases to which the waiver could apply.  And there are obvious reasons why insurance companies would not want to give such a broad waiver.  Second, the Court's observation makes clear that the waiver does not apply here ***because*** this is a mass tort case.

The Bankruptcy Court seemed to think that because the waiver letter expressly refers to Section 524(g) that somehow negates the substantial relationship among mass tort matters to which the waiver applies.  But that is not so.  Mr. Patton could, for example, serve as an FCR in a case where he has no involvement with coverage issues that directly affect the firm's insurance clients.  The same is true for bankruptcies that involve different insurance issues, as the above is not an exhaustive list of coverage disputes.

If this bankruptcy does not qualify as "substantially related," then this exception in the waiver letter is meaningless.  Young Conaway cannot be retained as counsel directly adverse to Certain Excess Insurers in a mass tort bankruptcy involving overlapping insurance coverage issues for long-tail claims.

As occurred in *Congoleum*, Mr. Patton did not contact the Certain Excess Insurers to notify them of the conflict of interest, relying instead on an "open-ended" prospective waiver. Young Conaway and Mr. Patton did not disclose to Debtors' alleged insurer, National Union, the potential opposing party or the existence of the plan to file bankruptcy, without which National

---

[84]  Appendix at APP00000566, Dkt. 636, Order of Judge Silverstein at 6.

Union cannot have appreciated the potential effect of a waiver. Nor did Young Conaway and Mr. Patton disclose to National Union that they were considering this retention.

These facts do not even approximate what is expected to show a knowing and intentional waiver. In *Elonix*, for instance, counsel identified the potential, specific patent infringement lawsuit that could create a conflict, the client was already aware of the possibility of the suit, and counsel discussed methods of dealing with the conflict. *Elonix*, 142 F. Supp. 2d at 583. As such, the court found that counsel sufficiently explained the potential conflict in order to obtain a prospective waiver. *Id.*

Only with "informed consent, confirmed in writing" that "clearly identif[ies] the client or clients" after "consult[ing] with the clients" may a law firm have such a concurrent conflict. Del. RPC 1.7(b)(4); *see* Cmt. 2 to Rule 1.7. By contrast to *Elonix*, and more similar to *Congoleum*, Young Conaway and Mr. Patton did not and could not identify the conflict here because they expressly agreed with Imerys to keep their retention by Imerys confidential.

### B. The Bankruptcy Court erred as a matter of law by suggesting an ethical wall eight months after the conflict arose.

The Bankruptcy Court acknowledged the concurrent conflict, but excused it, finding in its Bench Ruling that, "it would seem prudent for YCST to establish an ethical wall between this matter and matters in which they represent insurance companies in coverage litigation in asbestos related matters."[85] This determination misapplies the law, because ethical walls must be

---

[85] *See* Appendix at Appendix at APP00000566, Dkt. 636, Bench Ruling on Motion to Appoint James L. Patton, Jr. as the Legal Representative for Future Talc Personal Injury Claimants, at 12.

erected *prior* to the emergence of a potential or actual conflict.  And it is undisputed that there were no walls here until long after the potential and indeed actual conflict was revealed.

Because of the risk that disclosure of confidential or privileged material already occurred before the ethical screen was imposed, courts in the Third and Second Circuits disqualify firms in these circumstances:[86]

- *United States ex rel. Bahsen v. Bos. Sci. Neuromodulation Corp.*, 147 F. Supp. 3d 239, 249 (D.N.J. 2015) (disqualifying firm under New Jersey Rules of Professional Conduct for untimely erecting ethical wall where "no notice was given until after [client] discovered that its prior attorney was now employed by the firm suing it" and nothing prevented communication between attorneys at the firm when the conflict first arose);

- *Mitchell v. Metro. Life Ins. Co.*, No. 01 CIV. 2112 (WHP), 2002 WL 441194, at *10 (S.D.N.Y. Mar. 21, 2002) (disqualifying firm after holding that the firm did not formally implement an ethical screen until almost two months after it had actual notice of the conflict, which diminished the possibility that the screen remedied the conflict);

- *Atasi Corp. v. Seagate Technology*, 847 F.2d 826, 831 (Fed. Cir.1988) (holding that presumption of shared confidences was not overcome by screening where there was a complete lack of evidence that screening measures were taken at time of disqualified attorney's move to the firm);

- *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1462 (Fed.Cir.1984) ("[I]t was permissible for her [the district court judge] to hold that the screening arrangement must be set up 'when the potentially disqualifying event occurred' and the new firm knows (or must have been aware) of the problem.");

- *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1087 (S.D.N.Y.1989) (Patterson, J.) ("This Court doubts whether any Chinese walls,

---

[86]  *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1467 (S.D.N.Y. 1985) (disqualifying law firm because of evidence "indicating that confidences about the USFL may well have passed within the firm before [the firm] instituted its screen"); *LaSalle Nat'l Bank v. Lake County*, 703 F.2d 252, 259 (7th Cir.1983) (holding that the district court did not abuse its discretion in granting disqualification, because, among other reasons, "[S]creening arrangements were not established until the disqualification motion was filed in August 1981 . . . [N]o specific institutional mechanisms were in place to insure that information was not shared, even if inadvertently, between the months of February and August.").

which are meant to be preemptive, can ever function effectively when erected in response to a motion, and not prior to the arising of the conflict.") (citations omitted).

As in the long list of cases above, the same disclosure risks arose here because imposing an ethical wall eight months after Young Conaway's conflict arose does not provide "adequate protection of confidences." *Decora Inc. v. DW Wallcovering, Inc.*, 899 F. Supp. 132, 141 (S.D.N.Y. 1995) ("screening device implemented only after a disqualified lawyer has worked on a case will not usually provide adequate protection of confidences."). The Bankruptcy Court thus erred in applying the law on ethical walls.

Imposition of an ethical wall at this late date further requires disqualification because of the revelation that privileged information has been disclosed to the FCR, indicating Certain Excess Insurers insurance strategies in the *Imerys* bankruptcy, from which Young Conaway could call on its experience with Certain Excess Insurers in *Warren Pumps*. *See* Charles W. Wolfram, *Modern Legal Ethics* § 7.6.4, at 402 (West 1986) ("In the end there is little but the self-serving assurance of the screening-lawyer foxes that they will carefully guard the screened-lawyer chickens. Whether the screen is breached will be virtually impossible to ascertain from outside the firm. On the inside, lawyers whose interests would all be served by creating leaks in the screen and not revealing the leaks would not regularly be chosen as guardians by anyone truly interested in assuring that leaks do not occur.").

Young Conaway began its representation of the FCR in September of 2018, without notifying National Union or its other insurer-clients of the potential conflict. Indeed, had it disclosed the potential conflict, Young Conaway would have violated its retention letter.[87]

---

[87] *See supra* n. 8, FCR Retention Letter.

Mr. Patton also testified that he collaborates with a multitude of partners at his firm in this bankruptcy and suggested that he would draw from the experience of partners who represent underlying claimants in talc-related lawsuits.[88]  Yet only on May 8, 2019, did Young Conaway impose an ethical wall to prevent disclosure of privileged information between its lawyers who represent National Union and those who represent Debtors seeking insurance proceeds from National Union.

And on May 31, 2019, Debtors produced Certain Excess Insurers' privileged, common-interest communications to the Tort Claimants, including the FCR.  While on June 6, 2019, those documents were discovered and requested to be clawed back, evidence indicates that the Tort Claimants and FCR have reviewed these common-interest documents.  And Debtors refused to respond to discovery requests in March of 2019 about whether Debtors had produced similarly privileged documents to the FCR pre-petition.

**C.      The Bankruptcy Court could not have reached the right decision on conflicts because it refused to allow the necessary factual development.**

A professional seeking employment must disclose all of its connections with creditors and reveal any interests adverse to the estate.  *See* 11 U.S.C. § 101(14) and Bankruptcy Rule 2014.  Disclosure "goes to the heart of the integrity of the bankruptcy system."  *In re Universal Bldg. Prod.*, 486 B.R. 650, 663 (Bankr. D. Del. 2010) (failure of prospective counsel for unsecured creditors committee to provide complete and accurate disclosure at the outset of their

---

[88]    Appendix at APP00000412, Tr. of April 26, 2019 Hr'ng at 107:13-20 ("SCHIAVONI:  You may use Young Conaway personal injury lawyers who represent individual personal injury claims who are soliciting talc claims in connection with your work in this case as FCR?  PATTON:  I've done it in the Celotex case.  They have a very, very useful insight into how the tort systems works.").

43

connections with creditors warranted denial of committee's applications); *In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236–38 (Bankr. E.D. Cal. 1988) (disqualifying special counsel who failed to disclose that it represented co-defendants in litigation it was handling for debtor).

The duty to disclose conflicts of interest under Bankruptcy Rule 2014 is "sacrosanct." *See*, *e.g.*, *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994); *see generally* 9 Collier on Bankruptcy ¶ 2014.03 (15th ed. 2004). Timely and complete disclosure supports the Bankruptcy Court's obligation "to root out impermissible conflicts of interest' under Bankruptcy Code §§ 327(a) and 328(c)." *In re eToys, Inc.*, 331 B.R. 176, 189–90 (Bankr. D. Del. 2005).

The Bankruptcy Court could not have reached the right decision on conflicts because it refused to allow the necessary factual development. Specifically, the Court below denied the motion to compel Debtors' responses to discovery in connection with the FCR's appointment.[89] This is despite the supplemental disclosures of Mr. Patton's and Young Conaway's firm, which provided an inadequate basis for a fact-finder to conclude that they have met their burden to prove that there is no conflict, and which opened up new areas of inquiry.

On a spot-check basis alone, the disclosures contained glaring omissions.[90] For example, Mr. Patton asserted in his First Declaration that Young Conaway represents National Union and a half dozen other of Imerys' alleged insurers "in insurance coverage disputes that relate to

---

[89] *In re Duro Dyne*, No. BR 18-27963 (MBK), 2019 WL 4745879, at *7 (D.N.J. Sept. 30, 2019) ("Because the Bankruptcy Court appointed the nominated future claimants' representative after notice, discovery, and a hearing, and did not grant deference to the nominee, the Bankruptcy Court's process in selecting the representative was appropriate.").

[90] *See* APP00000136, Harron Declaration, attached as Ex. A to Debtors' Motion to Employ Young Conaway as [Mr. Patton's] Attorneys (Dkt. 101); *see also* Appendix APP00000100 Patton Declaration, attached as Ex. B to Debtors Motion to Appoint James Patton as FCR (Dkt. 100).

environmental liabilities including asbestos claims" without any other identifying information, such as the case name.[91] Mr. Patton's disclosure did not identify the insurers from which he had obtained a prospective waiver or the nature and terms of the waiver. Nor indeed did his firm provide the prospective waiver to Certain Excess Insurers' counsel when requested.[92]

Nor do the disclosures describe the conflicts that Mr. Patton has as a result of his firm's solicitation of current talc claimants. Mr. Patton does not disclose the identity of any of the personal injury claimants his firm has consulted with or represents—or which plaintiffs' firms now represent those claimants. Nor is there any disclosure concerning the co-counsel and referral relationships with the plaintiffs' lawyers who serve the Tort Claimants Committee in this case—the same concerns that arose in *Congoleum*. And Mr. Patton's supplemental disclosure does not disclose whether Young Conaway represented talc personal injury claimants prior to the date of his supplemental declaration.

These inadequacies standing alone preclude reliance by Mr. Patton's and Young Conaway's on their disclosures. "The scope of disclosure required under Rule 2014 is much broader than the issue of conflicts and disqualification." *In re C&C Demo, Inc.*, 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001) (citation omitted).[93] Failure—even a *de minimis* failure—to disclose all actual or potential conflicts in an independent ground for denying the retention.[94]

---

[91] *See id.* Appendix APP00000100 Patton Declaration at ¶13; APP00000136 Harron Declaration at ¶12.

[92] Appendix at APP00000572, Dkt. 698-1, Letter to Judge Silverstein Requesting Access to *in camera* documents.

[93] *See also In re Park-Helena Corp.*, 63 F.3d 877, 882 (9th Cir. 1995) (even if no conflict of interests existed, failure to describe in detail circumstances of the payment of a retainer violated disclosure requirements of Rule 2014)(citation omitted); *In re Filene's Basement, Inc.*, 239 B.R. 845, 849 (Bankr. D. Mass. 1999) ("It has been held that the [disclosure]

# CONCLUSION

Based on the foregoing arguments, Certain Excess Insurers respectfully request that this Court hold that the Court below erred when it held that the guardian-ad-litem standard supported appointing James Patton as FCR in light of the specific concurrent conflicts of interest here. In the alternative, this Court's should remand to the Bankruptcy Court for further fact finding and discovery of the conflicts of interest.

---

requirements of [Fed.R.Bankr.P. 2014] transcend those of § 327(a), as they mandate disclosure of all connections with the named parties, rather than being limited to those which deal with disinterestedness.") (citation omitted).

[94] *See In re Diamond Mortg. Corp. of Ill.*, 135 B.R. 78, 97 (Bankr.N.D.Ill.1990) (holding that "any fact which would be relevant to the court's determination of whether the professional has a conflict of interest, is not disinterested or represents an adverse interest, must be disclosed" and noting that a reviewing court has no duty to search a file to find conflicts of interest); *In re Envirodyne Indus., Inc.*, 150 B.R. 1008, 1021 (Bankr. N.D. Ill. 1993) ("Failure to abide by the disclosure requirements is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections were material or *de minimis*.") (citations omitted); *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992) ("Violation of the disclosure rules alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or were *de minimis*. . . compliance with these requirements is necessary to maintain the integrity of the bankruptcy system.").

Dated:  October 16, 2019                    Respectfully Submitted,


                                            By:  */s/ Stamatios Stamoulis*
                                                 Stamatios Stamoulis (#4606)

                                            STAMOULIS & WEINBLATT LLC
                                            800 N. West Street, Third Floor
                                            Wilmington, Delaware  19801
                                            Telephone:    +1 302 999 1540
                                            Facsimile:    +1 302 762 1688

                                            and

                                            O'MELVENY & MYERS LLP
                                            Times Square Tower
                                            7 Times Square
                                            New York, New York  10036-6537
                                            Telephone:    +1 212 326 2000
                                            Facsimile:    +1 212 326 2061

                                            Tancred Schiavoni (*pro hac vice*)
                                            tschiavoni@omm.com
                                            Janine Panchok-Berry (*pro hac vice*)
                                            jpanchok-berry@omm.com

                                            *Counsel for Columbia Casualty Company,*
                                            *Continental Casualty Company, the*
                                            *Continental Insurance Company, as successor*
                                            *to CNA Casualty of California and as*
                                            *successor in interest to certain insurance*
                                            *policies issued by Harbor Insurance Company,*
                                            *Lamorak Insurance Company (formerly known*
                                            *as OneBeacon America Insurance Company),*
                                            *as successor to Employers' Surplus Lines*
                                            *Insurance Company, Stonewall Insurance*
                                            *Company (now known as Berkshire Hathaway*
                                            *Specialty Insurance Company), National*
                                            *Union Fire Insurance Company of Pittsburgh*
                                            *PA, and Lexington Insurance Company to the*
                                            *extent that they issued policies to Cyprus*
                                            *Mines Corporation prior to 1981.*

**CERTIFICATE OF SERVICE**

I, Stamatios Stamoulis, certify that I am not less than 18 years of age, and that service of the foregoing **Opening Brief On Appeal** was caused to be made on October 16, 2019 on all counsel of record via CM/ECF.

/s/ Stamatios Stamoulis
Stamatios Stamoulis (#4606)