# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE
_____

IN RE: IMERYS TALC AMERICA, INC., IMERYS TALC VERMONT, INC., AND IMERYS TALC CANADA, INC.,

*Debtors.*
_____

CYPRUS HISTORICAL EXCESS INSURERS,

*Appellant,*

v.

IMERYS TALC AMERICA, INC., IMERYS TALC VERMONT, INC., IMERYS TALC CANADA, INC., AND FUTURE CLAIMANTS' REPRESENTATIVE

*Appellees.*
_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(No. 19-br-10289—Hon. Laurie Selber Silverstein)
_____

**BRIEF FOR APPELLEES IMERYS TALC AMERICA, INC., IMERYS TALC VERMONT, INC., AND IMERYS TALC CANADA, INC.**
_____

Jeffrey E. Bjork[*]
Amy C. Quartarolo[*]
Helena G. Tseregounis[*]
LATHAM & WATKINS LLP
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071-1560
(213) 485-1234
jeff.bjork@lw.com
amy.quartarolo@lw.com
helena.tseregounis@lw.com

Roman Martinez[*]
   *Counsel of Record*
Gregory B. in den Berken[*]
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
(202) 637-2200
roman.martinez@lw.com
greg.indenberken@lw.com

*(additional counsel on inside cover)*

_____

[*] admitted *pro hac vice*

Michael J. Merchant (Bar No. 2981)
Marcos A. Ramos (Bar No. 4450)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
merchant@rlf.com
ramos@rlf.com

Richard A. Levy[*]
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
richard.levy@lw.com

*Counsel for Appellees Imerys Talc America, Inc.,
Imerys Talc Vermont, Inc., and Imerys Talc Canada, Inc.*

## CORPORATE DISCLOSURE STATEMENT

As required by Federal Rule of Bankruptcy Procedure 8012 and 8014(b), Appellees Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada, Inc., submit the following corporate disclosure statement:

1.     Imerys Talc Vermont, Inc. is entirely owned by Imerys Talc America, Inc.

2.     Imerys Talc America, Inc. is entirely owned by Imerys Minerals Holding Limited.

3.     Imerys Minerals Holding Limited is entirely owned by Imerys USA, Inc., which is entirely owned by Imerys S.A.  Imerys S.A. is publicly traded on NYSE Euronext Paris.

4.     Imerys Talc Canada, Inc. is entirely owned by Mircal S.A.  Mircal S.A. is entirely owned by Imerys S.A.

5.     No publicly held company directly owns 10% or more of the stock of Imerys Talc America, Inc., Imerys Talc Vermont, Inc., or Imerys Talc Canada, Inc.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................................iv

INTRODUCTION ..............................................................................................1

STATEMENT OF THE ISSUES AND STANDARDS OF REVIEW....................2

PERTINENT STATUTES & RULES ..................................................................3

STATEMENT OF THE CASE.............................................................................3

    A.    Section 524(g)'s Framework For Mass-Tort Bankruptcies .................3

    B.    Patton's Prepetition Engagement As Proposed FCR ...........................6

    C.    Patton's Appointment As FCR................................................................8

SUMMARY OF ARGUMENT ............................................................................17

ARGUMENT ......................................................................................................19

I.    THE BANKRUPTCY COURT PROPERLY APPOINTED PATTON AS THE FCR..................................................................................................19

    A.    The Disinterestedness Test Governs FCR Appointments...................19

        1.    Applying The Disinterestedness Test Is Consistent With Section 524(g)'s Text, History, And Purpose...........................19

        2.    The Guardian-Ad-Litem Standard Does Not Apply.................21

        3.    ABA Model Rule 1.7 Does Not Apply To The FCR ...............23

    B.    Patton's Appointment Was Proper Under Any Test............................24

        1.    The Bankruptcy Court Properly Found Patton To Be Qualified, Experienced, And Trustworthy................................25

        2.    Patton Is Disinterested Under Section 101(14) ........................27

3.     The Affected Insurers Waived Any Alleged Conflict Of Interest Arising From *Warren Pumps* ........................................32

4.     The Future Talc Claimants Did Not Need To Waive Any Of The Asserted Conflicts Of Interest ......................................45

C.   The Bankruptcy Court's Discovery Ruling Was Not An Abuse Of Discretion ........................................................................52

CONCLUSION .......................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
561 F.3d 199 (3d Cir. 2009) ...............................................................19

*In re AFI Holding, Inc.*,
530 F.3d 832 (9th Cir. 2008) ......................................................28, 29

*In re AroChem Corp.*,
176 F.3d 610 (2d Cir. 1999) ........................................................28, 29

*In re BH&P, Inc.*,
949 F.2d 1300 (3d Cir. 1991) ............................................2, 27, 28, 29

*In re CellNet Data Sys., Inc.*,
327 F.3d 242 (3d Cir. 2003) ...............................................................49

*In re Cendant Corp. Secs. Litig.*,
404 F.3d 173 (3d Cir. 2005) ...............................................................51

*In re Combustion Eng'g., Inc.*,
391 F.3d 190 (3d Cir. 2005) ............................................4, 27, 32, 45

*In re Congoleum Corp*,
426 F.3d 675 (3d Cir. 2005) .......................................................*passim*

*De La Cruz v. Virgin Islands Water & Power Auth.*,
597 F. App'x 83 (3d Cir. 2014) .........................................................40

*In re Duro Dyne Nat'l Corp.*,
No. 18-cv-15563, 2019 WL 4745879 (D.N.J. Sept. 30, 2019) ..........5, 21, 22, 26

*Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*,
142 F. Supp. 2d 579 (D. Del. 2001).......................................30, 38, 47

*Emp'rs Ins. Co. of Wausau v. Munich Reinsurance Am., Inc.*,
No. 10-cv-3558, 2011 WL 1873123 (S.D.N.Y. May 16, 2011)........................42

*In re Fairbanks Co.*,
601 B.R. 831 (Bankr. N.D. Ga. 2019) ..........................................7, 21

*Fed. Ins. Co. v. W.R. Grace*,
   No. 04-cv-844, 2004 WL 5517843 (D. Del. Nov. 22, 2004) ..................5, 21, 46

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
   No. 13-cv-2100, 2018 WL 3991470 (D. Del. Aug. 20, 2018) ..........................39

*Forest Grove Sch. Dist. v. T.A.*,
   557 U.S. 230 (2009)...................................................................................21

*In re G-I Holdings, Inc.*,
   328 B.R. 691 (D.N.J. 2005) ...............................................................22

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ............................................................24, 51

*Gov't of India v. Cook Indus., Inc.*,
   569 F.2d 737 (2d Cir. 1978) .............................................................42

*In re IH 1, Inc.*,
   441 B.R. 742 (Bankr. D. Del. 2011).................................................39

*Javorski v. Nationwide Mutual Insurance Co.*,
   No. 06-cv-1071, 2006 WL 3242112 (M.D. Pa. Nov. 6, 2006)....................42, 43

*In re Johns-Manville Corp.*,
   36 B.R. 743 (Bankr. S.D.N.Y. 1984)..........................................20, 22

*Kaminski Bros., Inc. v. Detroit Diesel Allison*,
   638 F. Supp. 414 (M.D. Pa. 1985).....................................................43

*In re Kiwi Int'l Air Lines, Inc.*,
   344 F.3d 311 (3d Cir. 2003) ..............................................................52

*Local Loan Co. v. Hunt*,
   292 U.S. 234 (1934)............................................................................3

*In re Mid-Valley, Inc.*,
   305 B.R. 425 (Bankr. W.D. Pa. Feb. 11, 2004)...............21, 23, 31, 46

*Powers v. Ohio*,
   499 U.S. 400 (1991)..........................................................................46

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  278 F.3d 175 (3d Cir. 2002) .................................................................2

*Regalo Int'l, LLC v. Munchkin, Inc.*,
  211 F. Supp. 3d 682 (D. Del. 2016)....................................................43

*Ritchie Special Credit Invests., Ltd. v. U.S. Tr.*,
  620 F.3d 847 (8th Cir. 2010) ........................................................28, 29

*Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*,
  652 F. Supp. 1281 (D. Del. 1987).......................................................41

*In re Schott*,
  302 B.R. 113 (B.A.P. 10th Cir. 2003) .................................................19

*Sonos, Inc. v. D & M Holdings Inc.*,
  No. 14-cv-1330, 2015 WL 5277194 (D. Del. Sept. 9, 2015) ..............42

*Storino v. Borough of Point Pleasant Beach*,
  322 F.3d 293 (3d Cir. 2003) ...............................................................46

*Summy-Long v. Penn. State Univ.*,
  715 F. App'x 179 (3d Cir. 2017) ...................................................53, 54

*Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*,
  491 F. Supp. 2d 510 (D. Del. 2007)....................................................41

*In re TK Holdings Inc.*,
  No. 17-br-11375, 2018 WL 1306271 (Bankr. D. Del. Mar. 13,
  2018) ......................................................................................................4

*Torres v. Oakland Scavenger Co.*,
  487 U.S. 312 (1988)............................................................................19

*United States v. Igbonwa*,
  120 F.3d 437 (3d Cir. 1997) ...............................................................49

*In re UNR Indus., Inc.*,
  29 B.R. 741 (N.D. Ill. 1983) .........................................................21, 22

*In re UNR Indus., Inc.*,
  46 B.R. 671 (Bankr. N.D. Ill. 1985) ..............................................20, 22

*Viking Pump, Inc. v. Century Indem. Co.*,
    No. N10C-06-141, 2018 WL 2331990 (Del. Super. Ct. May 23,
    2018) ...........................................................................................15, 16, 41

*In re Wettach*,
    811 F.3d 99 (3d Cir. 2016) ................................................................2

## STATUTES

11 U.S.C.
    § 101(14)..................................................................................*passim*
    § 327(a) ...................................................................................*passim*
    § 524(g)(1)(A)...................................................................................5
    § 524(g)(2)(B)(ii)(IV)(bb) ...............................................................5
    § 524(g)(2)(B)(ii)(V) .......................................................................5
    § 524(g)(3)(A)...................................................................................5
    § 524(g)(4)(B)(i) ..........................................................................4, 31
    § 524(g)(4)(B)(ii) ...............................................................6, 7, 8, 52
    § 1104..............................................................................................20

Pub. L. No. 109-8, 119 Stat. 43 .......................................................21, 28

Pub. L. No. 111-327, 124 Stat. 3559 ...................................................21

Pub. L. No. 116-54, 133 Stat. 1086 .....................................................21

## RULES

Fed. R. Bankr. P. 8009 ........................................................................19

Fed. R. Bankr. P. 8012 ........................................................................19

Fed. R. Bankr. P. 8014(d) ...................................................................19

Fed. R. Bankr. P. 8015(a)(7)(B), (h)...................................................19

D. Del. L.R. 83.6(d) ............................................................................32

Del. Bankr. L.R. 9010-1(f)...................................................................32

ABA Model Rule 1.10(a)......................................................................29

ABA Model Rule 1.7 ......................................................................*passim*

ABA Model Rule 1.9 ................................................................40

## TREATISES

Ann. Model Rules of Prof'l Conduct r. 1.7 (9th ed. 2019)................................32, 47

7 *Collier on Bankruptcy* ¶ 1126.03[2][a] (16th ed. 2018) ........................................4

## OTHER AUTHORITIES

ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op.
05-435 (2004)........................................................................30

ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op.
05-436 (2005).......................................................34, 39, 40

H.R. Rep. No. 103-835, 40-41, 1994 U.S.C.C.A.N. 3340 (Oct. 4,
1994) ...................................................................................20

# INTRODUCTION

The bankruptcy court in this Chapter 11 proceeding exercised its discretion to appoint James Patton as the "Future Claimants' Representative" (FCR) to protect the interest of future talc claimants. It did so after listening to Patton's testimony, carefully scrutinizing his initial and supplemental disclosures, and issuing two opinions comprehensively addressing every objection. The court concluded that Patton has "the knowledge, experience[,] and expertise to be" the FCR, is "independent of the debtors and other parties-in-interest," and is "able to act with undivided loyalty to" future claimants. Appellants' Appendix (APP) 524, 527. For similar reasons, the court approved Patton's retention of Young Conaway Stargatt & Taylor, LLP, as his counsel.

Now on appeal, a group of insurance companies (the "Insurers") ask this Court to overturn the Patton appointment, alleging he is conflicted based on (1) Young Conaway's supposed representation of current talc claimants; and (2) Young Conaway's representation of some of the Insurers in *Warren Pumps v. Century Indemnity Co.*, No. N10C-06-141 (Del. Super. Ct.). The Insurers are wrong. As the bankruptcy court properly found, Young Conaway does not now represent any talc claimants, nor has it ever done so in the past. Nor is there is any material conflict with the relevant insurers, all of whom expressly waived any conflict of interest in connection with the completely unrelated *Warren Pumps* matter. The bankruptcy

court correctly held that Patton is ideally suited to protect the interest of future claimants in light of his impeccable qualifications and extensive experience. Those determinations are entitled to great deference by this Court, and in any event are entirely correct. And the bankruptcy court's denial of the Insurers' belated motion to compel was also proper.

The decision below should be affirmed.

## STATEMENT OF THE ISSUES
## AND STANDARDS OF REVIEW

1. Whether the bankruptcy court applied the correct legal standard in appointing the FCR. This is a pure question of law reviewed de novo on appeal. *See In re Wettach*, 811 F.3d 99, 104 (3d Cir. 2016).

2. Whether the bankruptcy court properly appointed Patton as the FCR. The appointment of bankruptcy officers and professionals is committed "to the bankruptcy court's sound exercise of discretion." *In re BH&P, Inc.*, 949 F.2d 1300, 1317 (3d Cir. 1991). This Court thus reviews for an abuse of discretion—meaning it examines if the appointment was based on a "clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 181 (3d Cir. 2002) (citation omitted).

## PERTINENT STATUTES & RULES

Relevant statutory provisions and rules are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Section 524(g)'s Framework For Mass-Tort Bankruptcies

In 1994, Congress enacted Section 524(g) of the Bankruptcy Code to facilitate the equitable resolution of bankruptcies involving liability to individuals with claims arising from asbestos-related diseases.  Congress recognized that debtors with potential asbestos-related liability faced a practical difficulty in resolving potential claims, because asbestos-related diseases often manifest long after individuals are first exposed.  Discharging the claims of such individuals before they know they have been injured potentially leaves them without a remedy.  But *not* doing so impairs bankruptcy law's core goal of providing a bankrupt entity with "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."  *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

Section 524(g) offers a solution to this problem:  It authorizes a Chapter 11 debtor to resolve its current *and* future asbestos liabilities by "channeling" them to a trust established by a confirmed Chapter 11 plan of reorganization.  To protect the interests of future claimants, Section 524(g) requires the bankruptcy court to "appoint[] a legal representative for the purpose of protecting the rights of persons

that might subsequently assert demands" against the trust. 11 U.S.C.
§ 524(g)(4)(B)(i). That legal representative—the FCR—participates with the debtor
and other key parties in negotiations over the plan establishing a Section 524(g) trust.
Bankruptcy courts also use Section 105(a)—which codifies the courts' equitable
authority to administer the Code—to channel non-asbestos mass-tort liabilities to a
trust in a similar manner to Section 524(g). *See, e.g.*, *In re TK Holdings Inc.*, No.
17-br-11375, 2018 WL 1306271, at *35 (Bankr. D. Del. Mar. 13, 2018).

The Bankruptcy Code authorizes debtors to expedite the bankruptcy process
by starting negotiations over a plan of reorganization even *before* filing for Chapter
11. Such "pre-packaged" or "pre-negotiated" bankruptcy plans "generally reduce
the time and expense of the chapter 11 case" and "allow a debtor to implement the
plan and emerge from chapter 11 sooner." 7 *Collier on Bankruptcy* ¶ 1126.03[2][a]
(16th ed. 2018). Given the need to ensure that the interests of future claimants are
protected during any prepetition negotiations, debtors regularly engage a proposed
FCR during this period.[1] In such instances, the proposed FCR's sole responsibility
is to represent the interests of future claimants in prepetition negotiations. Because
the bankruptcy court must ultimately approve the FCR appointment after the debtor

---

[1] *See, e.g.*, *In re Combustion Eng'g., Inc.*, 391 F.3d 190, 245 (3d Cir. 2005);
Order, *In re Duro Dyne Nat'l Corp*, No. 18-br-27963 (Bankr. D.N.J. Oct. 17, 2018),
ECF No. 191.

files a Chapter 11 petition, the proposed FCR is engaged without any guarantee of being appointed.

The Bankruptcy Code does not specify a process or legal standard for appointing an FCR. *See Fed. Ins. Co. v. W.R. Grace*, No. 04-cv-844, 2004 WL 5517843, at *5 (D. Del. Nov. 22, 2004). Typically, the debtor files a motion seeking the appointment of an FCR, which includes disclosures of the candidate's interests and connections so that the court can properly evaluate his suitability for the role. *See, e.g., In re Duro Dyne Nat'l Corp.*, No. 18-cv-15563, 2019 WL 4745879, at *2-3 (D.N.J. Sept. 30, 2019). The bankruptcy court then holds a hearing on the appointment, considers any objections, and enters an appropriate order. In analyzing whether the FCR's appointment is proper, "most courts have applied the disinterestedness standard" of 11 U.S.C. § 101(14). *Id.* at *7 (citing cases).

Section 524(g) requires the debtor to establish a funded trust capable of paying "present claims and future demands that involve similar claims in substantially the same manner." 11 U.S.C. § 524(g)(2)(B)(ii)(V). A plan including a channeling injunction under Section 524(g) must also (1) obtain the support of 75 percent or more of the current mass-tort claimants who vote on the plan; (2) be confirmed by the bankruptcy court; and (3) be affirmed by this Court. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), (g)(1)(A), (g)(3)(A). Among other things, the courts

must determine that the plan is "fair and equitable with respect to" future claimants. 11 U.S.C. § 524(g)(4)(B)(ii).

### B. Patton's Prepetition Engagement As Proposed FCR

Debtors Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc. (collectively, "Debtors") are three affiliated companies that mine, process, and distribute talc, a natural mineral with numerous commercial applications. Debtors supply talc to third-party manufacturers for use in their products, but Debtors do not themselves sell those products to consumers. APP3.

In recent years, Debtors have been sued in thousands of lawsuits across the country by individuals alleging that they suffer from certain asbestos-related and other diseases caused by exposure to Debtors' talc. APP3-4. Debtors' talc is safe and asbestos-free—and these claims are entirely without merit. But over time, the sheer number of claims and unwillingness of Debtors' insurers and indemnitors to provide coverage for defense costs and liability exposure have posed a growing threat to Debtors' financial viability.

As the number of claims grew, Debtors explored how to avoid bankruptcy and the costs and benefits of continued litigation. Debtors also explored whether to use Chapter 11 to address the mounting claims they were facing, and they examined the feasibility of pursuing a pre-packaged or pre-negotiated plan. APP21. Debtors ultimately concluded that engaging a potential FCR on a prepetition basis would be

appropriate to protect the interests of future claimants while Debtors explored a potential bankruptcy filing. *Id.*

In September 2018, Debtors identified James Patton as the prepetition FCR. Supplemental Appendix (SA) 86. Patton is one of the Nation's foremost experts on mass-tort bankruptcies. *See* SA93-95; *see also* SA114-19 (Patton's curriculum vitae). He has over 30 years of experience in complex mass-tort litigation, bankruptcies, and settlement trusts, including extensive experience in serving as an FCR in bankruptcy cases and post-bankruptcy settlement trusts. SA104-06. In appointing him to these roles, courts around the country have repeatedly lauded his integrity, stellar reputation, and skill in representing the interests of future claimants.[2]

---

[2] *See, e.g., In re Fairbanks Co.,* 601 B.R. 831, 843 (Bankr. N.D. Ga. 2019) (noting that Patton "has the skills and intent to advocate on behalf of future claimants and protect their interests" and that he has been selected as FCR due to "his proven abilities"); *id.* at 844 ("The Court is confident that future claimants, if asked who they would hire in this case, would select Mr. Patton."); SA544 (*In re Maremont Corp.*, No. 19-br-10118 (Bankr. D. Del. Mar. 8, 2019)) (noting Patton's "more than 30 years of experience with asbestos litigation, bankruptcies and settlement trust[s]" and his role as FCR in multiple cases); Additional Findings in Supp. of Affirmation Order at 14, *In re Leslie Controls, Inc.,* No. 11-mc-0013 (D. Del. Mar. 25, 2011), ECF No. 28 (calling Patton "clearly a qualified choice" to serve as FCR, and noting that he "exercised his responsibilities in good faith" and "spoke with knowledge and evident wisdom with respect to the challenges of representing the future claimants, revealing a reassuring level of sophistication in his analysis of the issues"); SA426-27 (*In re Leslie Controls, Inc.*, No. 10-br-12199 (Bankr. D. Del. Aug. 9, 2010)) (noting that Patton is "well-known" to "the asbestos bar," "to the Delaware bar," and "to the bankruptcy bar nationally"; emphasizing that court has "no doubt in [its]

Based on these qualifications, Debtors engaged Patton to serve as the proposed FCR in advance of any Chapter 11 filing. *See* SA86-87. Their written agreement provided that Patton's "sole responsibility and loyalty is to the future personal[-]injury claimants" he would serve as proposed FCR, and that Debtors "shall have no right to control or influence how [he] or [his] professionals carry out [their] duties." SA135. After his engagement, Patton retained Young, Conaway, Stargatt & Taylor, LLP as counsel to assist him with the representation. APP83.

Over the following months, Patton and his advisors conducted extensive diligence into Debtors' businesses, their assets and liabilities, and the pending and potential future talc litigation. SA87-88. They analyzed Debtors and their predecessors' historic talc operations, the availability of insurance and other assets, and the past and pending talc claims. *Id.*

## C.  Patton's Appointment As FCR

1.  In February 2019, Debtors filed their Chapter 11 cases. Soon afterward, Debtors moved the bankruptcy court to appoint Patton as FCR. SA83. The motion detailed Patton's qualifications and experience and fully explained his prepetition involvement in the case. SA85-88. The motion included a declaration from Patton,

---

mind that he will work diligently on behalf of the future claimants"; and explaining that "if the debtor were simply to come to me and say look, Judge, you need to find us a future claims representative, quite frankly I would have called Mr. Patton because I know of his experience in the area and I know of his reputation").

his engagement letter, curriculum vitae, and a chart of all past payments to Patton. SA83-139.

Patton's declaration described his qualifications and his involvement in the case, explained the diligence process he conducted before accepting the engagement, and attested that he was "disinterested" under 11 U.S.C. § 101(14). SA110. It also disclosed Young Conaway's representation of certain insurance companies, including National Union Fire Insurance Company of Pittsburgh, PA, and Lexington Insurance Company, "in insurance coverage disputes that relate to environmental liabilities including asbestos claims but [that are] unrelated to talc claims or the Debtors." SA109. The same day Debtors moved for Patton's appointment, Patton sought an order authorizing him to retain Young Conaway. SA140-53.

On March 13, 2019, a group of insurance companies filed a "limited objection" to Patton's appointment. APP160. Between 1961 and 1986, those insurance companies sold various policies to Debtors' predecessors and/or affiliates. In the Chapter 11 proceedings, Debtors have asserted that the proceeds of those policies are estate assets and that they lawfully acquired the rights to those policies in 1992. SA195-96; *see* SA184. In objecting to Patton's appointment, the insurers principally argued that Debtors should be required to disclose what information they had shared with Patton and Young Conaway in the prepetition phase. *See* APP160-

65.  The insurers did not mention any conflict of interest based on Young Conaway's representation of any insurers.  *See id.*[3]

In late March 2019, by agreement of Debtors and the U.S. Trustee, the bankruptcy court extended the objection deadline (with respect to *only* the U.S. Trustee) and continued the hearing date on Debtors' motion for Patton's appointment to April 10 and April 26, respectively.  *See* APP515.  The hearing was continued "so that discovery could take place," APP520, and so the U.S. Trustee could file an objection if it so chose, APP515.  Debtors specifically noted that if the Trustee "propose[d] additional [FCR] candidates," Debtors "would conduct interviews/mini depositions of those candidates in advance of [their] response deadline."  SA220.

On April 10, the U.S. Trustee filed an objection to Patton's appointment.  SA41.  Among other things, the U.S. Trustee argued that a higher standard than disinterestedness should apply and asked that the court "permit other parties in interest to nominate alternative candidates," APP230, in a "collective proceeding," APP217.  But neither the U.S. Trustee nor any other party proposed any alternative

---

[3] In their pleadings below, the objecting insurers self-identified as the "Cyprus Historical Excess Insurers" or "Certain Excess Insurers."  The make-up of this group has been confusingly ambiguous, as, over time, the group has sporadically and without explanation expanded or increased to include specific Insurers.  *Compare, e.g.*, APP160; APP285, *with* SA623; SA653.  This brief generally uses the term "Insurers" to refer to the insurers listed on Appellants' opening brief.

candidates of its own.  *See* APP216-32.  And no one filed a timely objection to Patton's application to retain Young Conaway as his counsel.

On April 19—nine days *after* the U.S. Trustee's extended objection deadline—the objecting insurers moved to compel discovery from Debtors or, alternatively, to further adjourn the hearing.  *See* APP285.  They did so in direct defiance of the bankruptcy court's late-March instruction that "if there are any [discovery] disputes that arise, just get [the court] on the phone.  Don't do a whole motion practice thing.  Just get [the court] on the phone and we'll get it handled." SA228.  The insurers sought an order compelling Debtors to respond to 15 document requests and 7 requests for admissions, virtually all of which were directed at what information Debtors had shared with Patton in the prepetition phase.  *See* APP171-79.

On April 26, 2019, the bankruptcy court conducted a hearing on Patton's appointment.  The court heard argument from Debtors' counsel, the U.S. Trustee, and the insurers' counsel about the legal standard governing FCR appointments.

Patton testified and was cross-examined by the U.S. Trustee's counsel and the insurers' counsel.  Patton discussed the conflicts check he conducted before his engagement, explaining that it involved a comprehensive review of "every name that . . . relates to parties that are adverse, . . . and all of [their] affiliates."  APP405. When asked about Young Conaway's representation of specific insurers, Patton

testified that the insurers had specifically waived any conflict of interest arising from those representations. APP406-07; *see* APP526.

Insurers' counsel also asked Patton about a page on Young Conaway's website appearing to solicit persons who believe they may have been harmed by talcum powder to contact the firm. *See* APP408-10. In response, Patton testified that, to the best of his knowledge, Young Conaway did not represent talc claimants. APP409-12.

2. On May 7, 2019, the bankruptcy court issued a Bench Ruling addressing the FCR appointment. *See* SA349-87; APP515. The court acknowledged the "long line of cases in which the disinterestedness standard was applied" to FCR appointments. APP527. But it nonetheless decided to apply a different standard, based on the court's belief that an FCR is "much more like a guardian ad litem than those persons in the [Bankruptcy] Code subject to the disinterestedness standard." APP524. The court held "that the standard for approval" under Section 524(g) is that the FCR "must be independent of the debtors and other parties-in-interest in the case and must be able to act with undivided loyalty to demand holders." APP527.

The court went on to find that "there is no question that [] Patton is up to the task" of serving as FCR. APP524. It explained that Patton's testimony was "credible" and that there was "no reason to doubt [his] testimony." APP526. As for Young Conaway's representation of specific insurers, the court noted that Patton

"testified that none of those representations involve Imerys or talc," and that "[Young Conaway] has waivers from each of the insurance companies." *Id.* As for the website, the court pointed out that Patton "testified that [Young Conaway] does not represent any clients who are asserting claims based on exposure to talc." *Id.*

The court directed Patton to file supplemental disclosures addressing the conflict waivers and firm-website issues belatedly raised by some of the insurers. APP526-27. The court also denied the insurers' motion to compel, noting that the motion "wasn't promptly placed before [the court] in connection with th[e] hearing." SA580.

3. On May 13, Patton filed a supplemental declaration. APP528. Patton explained that "[n]either Young Conaway nor [he] represent any clients who are asserting claims based on exposure to talc," and that he "ha[s] not, personally, provided representation to any insurance company in any insurance-coverage litigation handled by Young Conaway." APP529. He also stated that, based on discussions with Young Conaway's general counsel and his review of the rules of professional conduct, "Young Conaway's representation of insurance companies in other matters will not impose any constraints on [his] ability to take a position as the legal representative for Future Claimants." *Id.* Patton also provided an example of the conflict-waiver provisions in Young Conaway's engagement letters with the insurers. *See* APP529-30; *infra* at 35-36.

On May 17, Patton filed a second supplemental declaration in which he further confirmed that "Young Conaway has no insurance-coverage representations related to talc." APP533. He also informed the court that "Young Conaway's sole remaining active representation of insurance companies in a matter related to asbestos is through an engagement with a single agent utilizing a single engagement letter," and that the waiver in that engagement letter is the exemplar language he previously provided. APP534.

Also on May 17, Debtors' counsel proposed a revised order to appoint Patton and authorize the retention of Young Conaway. SA587-602. The revised order incorporated revisions requested by the U.S. Trustee, who did "not object to the form of the Revised Order." SA589. Later that same day, a slightly different group of insurers filed a "supplemental objection" to the proposed order. SA603-23. These insurers argued, among other things, that Young Conaway's representation of "various insurers" in a Delaware Superior Court matter, *Warren Pumps v. Century Indemnity Co.*, No. N10C-06-141, presented a concurrent conflict precluding Patton's appointment. SA607. A few days later, counsel for the claims administrator of certain insurers—Mr. Mark Muth—filed a declaration objecting to

Patton's appointment and Young Conaway's retention based on the *Warren Pumps* matter. APP554-57.[4]

*Warren Pumps* is an insurance-coverage dispute in which two industrial-pump manufacturers sued a number of insurance companies—including Continental Insurance Company, National Union, and Lexington—to obtain coverage under certain excess-insurance policies for asbestos-related personal-injury claims. *Viking Pump, Inc. v. Century Indem. Co.*, No. N10C-06-141, 2018 WL 2331990, at *1 (Del. Super. Ct. May 23, 2018). The issues in the case were whether certain primary insurance policies were properly exhausted, whether the excess policies "follow-form" to the primary policies, whether New York law governs these issues, and various other policy-specific issues like "'loss runs,' horizontal exhaustion, and" the extent of a previous Delaware Court of Chancery ruling in favor of the plaintiffs. *Id.* at *2-3 (discussing the Superior Court, "Phase III," proceedings). All of those issues were resolved by the Delaware Superior Court in 2014, and the Delaware Supreme Court affirmed and reversed in part in 2016. *See id.* at *3-4. The sole remaining issue in the case is the form of the final judgment. *See id.* at *1, 8-9.

---

[4] As noted below (*infra* at 16), the insurers did not offer testimony from Mr. Muth at the April 26, 2019 hearing before the bankruptcy court.

As Patton disclosed to the bankruptcy court, Young Conaway has represented various insurers in the *Warren Pumps* litigation. *See* APP564.[5] But Patton has played no personal role in that representation whatsoever. APP529. Nor have any of the Young Conaway personnel representing the FCR in this case. SA645. The *Warren Pumps* case is thus entirely unrelated to the Debtors' chapter 11 cases: It does not involve Debtors, talc, or the insurance policies that are potentially implicated in this bankruptcy proceeding. Perhaps for that reason, the U.S. Trustee did not join in the insurers' objections.

4. On May 31, 2019, the bankruptcy court issued a Further Ruling addressing Patton's appointment. APP561. Regarding the "supplemental objection" and Muth's declaration, the court noted that it "did not request additional filings" and "did not re-open the evidentiary hearing held on [Debtors'] motion at which Mr. Muth could have testified, but did not." APP562. And the court remarked that the supplemental objection was "both confusing and largely irrelevant to the issues actually presented by the Supplemental Declarations, and for that matter, Mr. Patton's original declaration." *Id.*

---

[5] Patton's initial declaration did not specifically mention Continental, but Young Conaway's representation of Continental was subsequently discussed at the hearing, APP106, APP406-07, and the representation was reflected on the engagement letter that the bankruptcy court reviewed *in camera*, APP564.

The bankruptcy court nevertheless comprehensively addressed all asserted objections. *See* APP562-69. The court explained that it had reviewed *in camera* the engagement letter for the *Warren Pumps* insurers. In a thorough analysis, the court concluded that the waiver was "effective" and waived any potential conflict arising from Patton's involvement in this case. APP569. And the court found that Patton's supplemental declaration was "definitive" and established that Young Conaway does not and has not represented talc claimants. APP563. The court also found that none of the other issues raised by the insurers had any merit, appointed Patton as the FCR, and authorized his retention of Young Conaway. *See* APP561-69; SA640-43; SA649-52.

## SUMMARY OF ARGUMENT

The bankruptcy court properly appointed Patton as the FCR, although it did so under an incorrect legal standard. That decision should be affirmed.

As virtually every court addressing the issue has recognized, FCR appointments are subject to 11 U.S.C. § 101(14)'s "disinterestedness" test, which requires an FCR to have no personal interest materially adverse to the interest of the estate or of any class of creditors or equity security holders. The bankruptcy court's application of a guardian-ad-litem test directly contradicts this nearly uniform practice, as well as legislative history plainly rejecting that test.

In any event, Patton's appointment was proper under any standard. He has impeccable qualifications and a stellar reputation, and the bankruptcy court did not abuse its discretion in finding that he is qualified, experienced, trustworthy, and unequivocally "up to the task." APP524. Patton easily satisfies Section 101(14)'s disinterestedness test, because that test covers only *personal* interests—not those resulting from professional representations. No one has asserted any personal conflict of interest here.

Nor is there any conflict of interest under the American Bar Association Model Rules of Professional Conduct (the "Model Rules"). The bankruptcy court evaluated Patton's testimony and other evidence and found that Young Conaway has not and does not represent current talc claimants. And the detailed and particularized prospective-conflicts waiver executed by the *Warren Pumps* insurers unambiguously covers this case.

Finally, the bankruptcy court's rejection of the Insurers' motion to compel discovery was also plainly correct. The Insurers delayed bringing the motion, and there was no need for further discovery to evaluate Patton's fitness to serve as FCR.

# ARGUMENT[6]

## I. THE BANKRUPTCY COURT PROPERLY APPOINTED PATTON AS THE FCR

### A. The Disinterestedness Test Governs FCR Appointments

The Bankruptcy Code is silent on the standard that governs FCR appointments. But virtually every court to have considered the issue has held that a proposed FCR must satisfy the disinterestedness test of 11 U.S.C. § 101(14). Here, the bankruptcy court erred by refusing to apply that test in favor of a novel guardian-ad-litem standard that Congress rejected. And the Insurers are wrong to assume that Patton's appointment is subject to 11 U.S.C. § 327(a) or Model Rule 1.7.

#### 1. Applying The Disinterestedness Test Is Consistent With Section 524(g)'s Text, History, And Purpose

Section 101(14) defines a "disinterested person" as one who:

**(A)** is not a creditor, an equity security holder, or an insider;

**(B)** is not and was not, within 2 years before the date of the filing of the [bankruptcy] petition, a director, officer, or employee of the debtor; and

---

[6] The Insurers' opening brief suffers from multiple procedural defects, including: (1) it purports to name Lexington Insurance Company as a party to this appeal even though Lexington did not file a notice of appeal and thus is *not* a party, *see Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314 (1988); *In re Schott*, 302 B.R. 113, 113 n.14 (B.A.P. 10th Cir. 2003); APP558; SA653-58; (2) it fails to include a corporate disclosure statement, *see* Fed. R. Bankr. P. 8012; (3) it is 465 words over the word limit and lacks a word-count certification, *see* Fed. R. Bankr. P. 8015(a)(7)(B), (h); (4) it fails to include the relevant statutes and rules, *see* Fed. R. Bankr. P. 8014(d); and (5) its accompanying appendix improperly includes 109 pages of material that post-date the bankruptcy court's rulings, *see* APP578-745; *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 225-26 (3d Cir. 2009); Fed. R. Bankr. P. 8009.

**(C)** does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14). This disinterestedness test governs the selection of key personnel appointed to safeguard the interests of essential stakeholders in bankruptcy—including, most notably, the trustee appointed to administer a bankruptcy estate while Chapter 11 proceedings are ongoing. *See* 11 U.S.C. § 1104.

Because an FCR is analogous to a trustee in relevant respects, the disinterestedness test should likewise govern the selection of the FCR under Sections 105 and 524(g). Indeed, Section 524(g)'s legislative history confirms that this was Congress's intent. Congress enacted Section 524(g) to codify the procedures used in "two pioneering cases"—*In re UNR Indus., Inc.*, 46 B.R. 671 (Bankr. N.D. Ill. 1985) and *In re Johns-Manville Corp.*, 36 B.R. 743 (Bankr. S.D.N.Y. 1984). *See* H.R. Rep. No. 103-835, 40-41, 1994 U.S.C.C.A.N. 3340, 3348 (Oct. 4, 1994) (explaining that Section 524(g) was modeled after *Johns-Manville* and *UNR* and was enacted to codify the "high standards" used in those cases). The courts in those cases used their inherent equitable authority and Section 105(a) to formulate the procedures that Congress codified in Section 524(g). Most notably, the *UNR* court specifically instructed the parties to propose "a *disinterested* party to serve as Legal Representative," 46 B.R. at 677 (emphasis added), and it expressly held that "the Court could not, within traditional equity doctrine, appoint a guardian ad litem to

represent all unknown future claimants," *In re UNR Indus., Inc.*, 29 B.R. 741, 744 n.3 (N.D. Ill. 1983).

By codifying the approach taken in *UNR*, Congress thus directly approved of the disinterestedness standard. For these reasons, nearly every court to have addressed this issue has applied the disinterestedness test. *See Duro Dyne*, 2019 WL 4745879, at *7-8.[7] And although Congress has repeatedly amended Section 524 against the backdrop of this uniform approach, it has never amended Section 524(g)(4)(B)(i)'s procedures for appointment of the FCR or otherwise suggested any disagreement with the disinterestedness standard.[8] Congress's acquiescence further confirms that Section 101(14)'s disinterestedness test applies here. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-40 (2009).

## 2. The Guardian-Ad-Litem Standard Does Not Apply

The bankruptcy court rejected the disinterestedness test in favor of a guardian-ad-litem standard, but that was error. *See* APP523-24. That standard has no basis

---

[7] *See also, e.g.*, *Grace*, 2004 WL 5517843, at *5-7; *In re Mid-Valley, Inc.*, 305 B.R. 425, 433 (Bankr. W.D. Pa. Feb. 11, 2004); SA543 (*Maremont*, No. 19-br-10118 (Bankr. D. Del. Mar. 8, 2019)); SA424 (*Leslie*, No. 10-br-12199 (Bankr. D. Del. Aug. 9, 2010)). Until the decision below, only one other bankruptcy court has applied the guardian-ad-litem standard. *See Fairbanks*, 601 B.R. 831 (appointing Patton).

[8] *See* Small Business Reorganization Act of 2019, Pub. L. No. 116-54, § 4(a)(9)(A)-(C), 133 Stat. 1086, 1087; Bankruptcy Technical Corrections Act of 2010, Pub. L. No. 111-327, 124 Stat. 3559; Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 43, 194.

in the Bankruptcy Code. It also leads to the bizarre result that the standard for appointing an FCR is *more* demanding than the standard for appointing a bankruptcy trustee with far greater power and responsibility. *See Duro Dyne*, 2019 WL 4745879, at *9 (explaining that trustee has power to bind estate, whereas FCR cannot bind future claimants). Given "the subordinate relationship and limited responsibilities of the [FCR]," it makes no sense to hold the FCR to a higher standard than the trustee. *Id.*

Moreover, the legislative history weighs heavily against applying the guardian-ad-litem standard. Neither of the cases Congress intended Section 524(g) to codify used that test. As noted, *UNR* expressly *rejected* a guardian-ad-litem test. 29 B.R. at 744 n.3; 46 B.R. at 677. And *Johns-Manville* did so implicitly, by recognizing that whereas a guardian ad litem has inherent authority to bind its ward through "the doctrine of equitable virtual representation," an FCR has no such power to bind future claimants. 36 B.R. at 758 n.7; *see also In re G-I Holdings, Inc.*, 328 B.R. 691, 698 (D.N.J. 2005) (recognizing that *Johns-Manville* "ultimately rejected the guardian[-]ad[-]litem model and its concomitant ability to bind future claimants"). This Court should not apply a standard that Congress rejected when it codified *UNR* and *Johns-Mansville* in Section 524(g).

### 3.    ABA Model Rule 1.7 Does Not Apply To The FCR

The Insurers also invoke ABA Model Rule of Professional Conduct 1.7 as a basis for evaluating Patton's fitness to serve as FCR.  Br. 35, 37.  But Rule 1.7 does not apply here either.  Rule 1.7 is part of the broader set of rules governing the "Client-Lawyer Relationship," and it bars a lawyer from representing a client when doing so would pose an actual or potential conflict of interest.  Specifically, Rule 1.7(a) provides that "a lawyer shall not represent a *client* if the representation involves a concurrent conflict of interest" (emphasis added), unless Rule 1.7(b)'s conditions are satisfied.

Rule 1.7(a) does not bar Patton's appointment as FCR because the future claimants are not his "clients."  The FCR does not serve as a lawyer for the future claimants.  He "stands in the shoes of the future demand holders" as their "alter ego," but is "not their attorney."  *Mid-Valley*, 305 B.R. at 433; *see also* Appellants' Br. 7 (acknowledging that the FCR "has no actual clients"); APP522 (noting that FCR "is the substitute for the principal, if you will, or the client in the client/attorney relationship").  Indeed, when the bankruptcy court pointed out that the FCR "[i]s not counsel" to the future claimants, but is *himself* rather more akin to "the client," the Insurers' counsel professed to "agree with [the court] 100 percent."  APP327.

Moreover, even if the FCR were serving as a lawyer for the future claimants, Rule 1.7(a) would *still* not apply.  The ABA commentary makes clear that Rule

1.7(a)'s conflicts provision does not apply when the lawyer is representing a class of unnamed and unidentified individuals as to which it is impossible to reliably identify conflicts of interests or obtain necessary waivers. "When a lawyer represents or seeks to represent a class of plaintiffs or defendants in a class-action lawsuit, unnamed members of the class are ordinarily not considered to be clients of the lawyer for purposes of" Rule 1.7(a)(1). ABA Model Rule 1.7 cmt. 25. As a result, the lawyer is free to take on the representation without first obtaining the consent of the unnamed class members. *Id.* In such cases, selection and oversight of counsel to represent the interests of absent class members is left to the reasoned discretion of district courts, not Rule 1.7. *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995).

Although this case is not a class-action lawsuit, the same principles generally apply: It would be impossible for any FCR to vet potential conflicts of interests with unidentified future claimants. As a result, even if the FCR were somehow deemed to have an attorney-client relationship with future claimants for other purposes, that relationship would not be subject to Rule 1.7(a)(1).

### B. Patton's Appointment Was Proper Under Any Test

Although the bankruptcy court erred in not applying the disinterestedness test, that error makes no difference here: Patton's appointment was appropriate under any standard, and his appointment as FCR was not an abuse of discretion.

### 1. The Bankruptcy Court Properly Found Patton To Be Qualified, Experienced, And Trustworthy

The bankruptcy court appointed Patton based on a robust evidentiary record including his initial declaration, curriculum vitae, the September 2018 engagement letter, his hearing testimony, and two supplemental declarations. *See* APP561-62. After carefully reviewing these materials, the bankruptcy court declared that "there is no question that [] Patton is up to the task," that "he has the knowledge, experience and expertise to be the legal representative for demand holders, and that "[n]o one . . . questions his experience or professionalism." APP524.

Those conclusions were spot on. Patton has over 30 years of experience in complex mass-tort litigation, bankruptcies, and settlement trusts. APP101-02. He has worked on Section 524(g) bankruptcy cases and trusts for 24 years, APP386, spanning over 30 different cases, APP366. He has been appointed and serves as the FCR in six other Section 524(g) bankruptcies. *See* APP386-87, APP102. No court has ever declined to appoint him as FCR, and courts have rejected objections to his appointment as meritless—including under the guardian-ad-litem standard applied here—in four different cases. *See* APP386-87. Indeed, Patton's reputation for integrity and competence is exemplary and has repeatedly been recognized by bankruptcy courts. *See supra* at 7 n.2 (quoting laudatory statements in multiple cases).

The Insurers suggest that Patton's prepetition work was somehow inappropriate or disqualifying because he was selected by Debtors. *See* Br. 17, 43. They are mistaken. As noted, pre-packaged and pre-negotiated bankruptcies bankruptcies (which *require* the participation of a proposed FCR) are favored because they reduce the time and expense of a bankruptcy by streamlining the process. *See supra* at 4. Debtors acted reasonably in engaging Patton as proposed FCR to protect the interests of future claimants in the prepetition phase, consistent with common practice in such cases. Moreover, Patton's engagement agreement clearly reflected that his *only* obligation was to protect the rights of future claimants, and his prepetition work has created efficiencies now saving Debtors' estate considerable resources since his appointment as FCR. *See* APP132; *see generally Duro Dyne*, 2019 WL 4745879, at *12-13 (upholding findings that prepetition service created no materially adverse interest).

The unstated implication of the Insurers' argument is that pre-packaged and pre-negotiated bankruptcies may *never* be pursued in mass-tort bankruptcies, because any proposed FCR operating in the prepetition phase will necessarily be conflicted. That implication conflicts with decades of precedent and reflects bad policy that would undermine the core goals of Section 524(g) and the Bankruptcy Code generally. *See In re Congoleum Corp*, 426 F.3d 675, 693 (3d Cir. 2005);

*Combustion Eng'g*, 391 F.3d at 201.  Patton's prepetition work poses no obstacle to his appointment here.

### 2.    Patton Is Disinterested Under Section 101(14)

Under 11 U.S.C. § 101(14), a "disinterested person" is one who "(A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders."   Here, Patton indisputably satisfies subparagraph (A) and (B).   The Insurers challenge only whether Patton satisfies subparagraph (C), given various alleged conflicts resulting from client representations purportedly undertaken by his law firm, Young Conaway.  *See* Br. 32-36.  He does satisfy subparagraph (C).

The Third Circuit has emphasized that the bankruptcy court "is on the front line" and thus "in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails."  *BH&P*, 949 F.2d at 1312-1313 (internal quotation marks omitted).  It has noted that conflicts for professionals under the Bankruptcy Code must be analyzed on a "case-by-case basis," that this analysis must necessarily be "flexible," and that bankruptcy courts have broad discretion in conducting this inquiry.  *Id.* at 1312, 1316.

The Third Circuit has also conclusively held that the only conflicts capable of triggering subparagraph (C) are those resulting from an individual's "*personal* interest[s]" adverse to the estate or a class of creditors. *Id.* at 1309-10 (explaining that disinterestedness turns on "*personal* status," so whether the person "*personally* 'ha[s] an interest' which is 'materially adverse' under subparagraph [(C)]" (emphasis added)). As the Second Circuit has likewise explained, "[S]ection 101(14)([C]) is properly read 'to implicate only the *personal* interests' of the professional whose disinterestedness is under consideration. Accordingly, to run afoul of section 101(14)([C]), a professional *personally* must 'have' the prohibited interest." *In re AroChem Corp.*, 176 F.3d 610, 629 (2d Cir. 1999) (citation omitted and emphasis added); *see also Ritchie Special Credit Invests., Ltd. v. U.S. Tr.*, 620 F.3d 847, 853 (8th Cir. 2010); *In re AFI Holding, Inc.*, 530 F.3d 832, 848 (9th Cir. 2008).[9]

Because Section 101(14)(C) focuses exclusively on the individual's *personal* interests, it does not cover interests that the individual is merely *representing* (for example, as an attorney). In that respect, it differs from the broader test governing a trustee's retention of professionals under 11 U.S.C. § 327(a). Unlike Section

---

[9] *BH&P* and *AroChem* interpreted Section 101(14)(E), which was recodified as Section 101(14)(C) in 2005 without change to its language. *See* Pub. L. No. 109-8, 119 Stat. 43.

101(14)(C), Section 327(a) requires that professionals not "do not hold *or represent* an interest adverse to the estate." 11 U.S.C. § 327(a) (emphasis added). "Where section 327 explicitly applies to persons who hold *or represent* adverse interests, disqualifying both," Section 101(14)(C) "refers only to those who *have* disqualifying interests." *BH&P*, 949 F.2d at 1310 n.12; *see also AroChem*, 176 F.3d at 629 (law firm's "'represent[ation]' [of] interests adverse to a class of" creditors did not mean that it "personally . . . 'ha[d]' such an adverse interests," and thus it remained "a 'disinterested' person'"); *Ritchie*, 620 F.3d at 853 (noting that "the [disinterested] definition is construed to apply only to personal interests . . . , not those attributed to [a professional] in his representative or fiduciary capacity"); *AFI Holding*, 530 F.3d at 848 (same point).

Here, it is undisputed that Patton has no *personal* interest materially adverse to the interests of the estate or to any class of creditors or equity security holders. The Insurers' argument that he fails the disinterestedness test rests exclusively on the interests of various clients of Young Conaway, Patton's firm, in the *Warren Pumps* litigation. *See* Br. 22. But such client representations are not imputed to Patton because he is not serving as an attorney in his role as FCR. *See* Model Rule 1.10(a) ("[w]hile lawyers are associated in a firm, none of them shall knowingly *represent a client*" based on an imputed conflict (emphasis added)). Moreover, even if those client representations could be imputed to Patton, they would not create any

*personal* interest of his own. At most, they create a representative interest that is outside the scope of Section 101(14).

Simply put, Patton would not "have an interest materially adverse" to the future claimants for purposes of Section 101(14)(C) simply because Young Conaway is representing insurers in *Warren Pumps*. Indeed, the ABA has made clear in analogous circumstances that representing a party in a suit that may prompt an insurance claim by the defendant does not establish adversity between the plaintiff and the insurer. *See* ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op. 05-435 (2004) ("representation of the plaintiff is not directly adverse and therefore does not present a concurrent conflict of interest to the lawyer's representation of the insurer in [an]other action").

Other considerations confirm that Patton neither has nor represents an interest *materially* adverse to the future claimants simply due to Young Conaway's involvement in *Warren Pumps*. As Patton made clear, neither he nor any of the Young Conaway personnel representing the FCR has played any personal role in that representation whatsoever. APP529; *see also* SA645. And the *Warren Pumps* litigation is, in any event, completely unrelated to this case. *See supra* at 15-17; *infra* at 32-44 (discussing alleged *Warren Pumps* conflict in greater detail); *see also Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 582 (D. Del. 2001) ("[A]n impermissible conflict is not always created when a simultaneous

representation concerns an unrelated matter."). There is simply no reason to believe Young Conaway's involvement in *Warren Pumps* will have any material impact on Patton's work in this case.

In denying that Patton is disinterested, the Insurers repeatedly invoke Section 327(a), which governs a bankruptcy trustee's "[e]mployment of professional persons,"—such as "attorneys, accountants, appraisers, [and] auctioneers"—"to represent or assist the trustee in carrying out the trustee's duties under [the Code]." *See* Br. 33, 36, 44, 46. Section 327(a) requires that professionals serving the trustee (1) be "disinterested," and (2) not "hold or represent an interest adverse to the estate." 11 U.S.C. § 327(a).

As the bankruptcy court held, APP517, Section 327(a) does not apply here: The FCR is not an attorney hired to "represent or assist the trustee," 11 U.S.C. § 327(a), but rather a legal representative appointed to "protect[] the rights" of future claimants, 11 U.S.C. § 524(g)(4)(B)(i), by serving as their "alter ego," *Mid-Valley*, 305 B.R. at 433. The Insurers have not explained how FCR appointments are subject to Section 327(a), nor have they identified any precedent adopting that approach. Although the Insurers cite (at 32-36) no less than 21 cases in arguing that Patton is not disinterested, *none* of those cases applies Section 327(a) to an FCR appointment. The bankruptcy court thus properly held that Section 327(a) has no bearing on this case. APP517.

### 3. The Affected Insurers Waived Any Alleged Conflict Of Interest Arising From *Warren Pumps*

The Insurers also argue that Patton has a conflict of interest under Model Rule 1.7 due to Young Conaway's representation of some of them in the *Warren Pumps* litigation. *See* Br. 36-40. Not so. Even if Rule 1.7 applies to the FCR (which it does not, *see supra* at 23-24), most of the Insurers lack standing to raise a Rule 1.7 objection because Young Conaway does not actually represent them. In any event, the argument fails on the merits, because the only affected Insurers expressly waived any conflict of interest when they hired Young Conaway.[10]

a. Most of the Insurers lack standing to invoke any conflict of interest based on *Warren Pumps*. "Standing to appeal in a bankruptcy case is limited to 'persons aggrieved' by an order of the bankruptcy court," which requires that the person's "rights or interests are 'directly and adversely affected pecuniarily.'" *Combustion Eng'g*, 391 F.3d at 214 (citation omitted); *see also* Ann. Model Rules of Prof'l Conduct r. 1.7 (9th ed. 2019) ("The general rule is that only a former or current client has standing to bring a motion to disqualify counsel on the basis of a conflict of interest." (citing cases)).

---

[10] The parties agree that the Model Rules provide the standards for attorneys' professional conduct before the bankruptcy court and this Court. *See* Appellants' Br. 32 n.76; Del. Bankr. L.R. 9010-1(f); D. Del. L.R. 83.6(d).

As noted, Lexington is not a party to this appeal. *See supra* at 19 n.6. And Columbia Casualty Company, Lamorak Insurance Company, and Stonewall Insurance Company are not harmed by the purported conflict because (1) Young Conaway does not represent them in *Warren Pumps*, *see* APP564; and (2) they have not argued that alleged conflict "directly and adversely" affects them pecuniarily. They accordingly lack standing to appeal the *Warren Pumps* issue. Continental and National Union are therefore the only parties that even arguably have standing to raise the issue.

b. In any event, Young Conaway's representation of the insurers in *Warren Pumps* is fully consistent with Rule 1.7. The Insurers appear to believe Patton's service as FCR would create an impermissible conflict of interest under Rule 1.7(a)(1) because the future claimants are aligned with Debtors in believing that the insurers' coverage obligations require them to contribute to the Section 524(g) trust. *See* Br. 36-40. That argument fails: As the bankruptcy court found, the Insurers executed a valid waiver that directly authorizes Patton's work here as FCR. *See* APP562-69.

Rule 1.7(a) generally instructs that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." It explains that a concurrent conflict of interest exists if either:

> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Model Rule 1.7(a). Rule 1.7(b) then creates an exception to Rule 1.7(a), under which a lawyer can represent a client—despite the existence of a concurrent conflict—so long as he obtains both clients' consent:

> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>
> (4) each affected client gives informed consent, confirmed in writing.

The Model Rules allow clients to waive future conflicts of interest under Rule 1.7(b). As the ABA Standing Committee on Ethics and Professional Responsibility has explained, "a lawyer in appropriate circumstances may obtain the effective informed consent of a client to future conflicts of interest." ABA Standing Comm. on Ethics & Prof'l Responsibility, Formal Op. 05-436 (2005); *see also* Model Rule 1.7 cmt. 22 (noting that waivers are subject to Rule 1.7(b)).

And there likewise can be no doubt that Rule 1.7's waiver rules fully apply to this case. As the Third Circuit explained in *Congoleum*, "concurrent conflicts may be waived by clients under the . . . ABA Rules of Professional Conduct"—including in bankruptcy cases—so long as the proper consent is obtained. 426 F.3d at 691. The Insurers' assertions (at 34-36) that conflict waivers are "prohibit[ed]" in bankruptcy cases are flat wrong. In making this claim, the Insurers rely on inapposite authority applying Section 327(a), which is not at issue here.

When Continental, National Union, and Lexington engaged Young Conaway in *Warren Pumps*, they executed a detailed and specific future-conflicts waiver. *See* APP564-65. The waiver reads as follows:

> **Disclosure of Workout/Bankruptcy/Insolvency Practice and Waiver of Conflicts:**
>
> [1] As a general matter, our Firm represents many other companies and individuals. It is possible that during the time that we are representing You, some of our present or future clients could have disputes with or matters adverse to You.
>
> [2] As You are aware, the Firm has a substantial corporate workout, bankruptcy and insolvency practice. ***Accordingly, You agree that the Firm may represent other clients*** (i) in workout, bankruptcy and insolvency proceedings, and (ii) ***in connection with trusts established pursuant to section 524(g) of the Bankruptcy Code*** (collectively (i) and (ii) are referred to below as the "Bankruptcy Related Matters"). This is so provided that: (i) the Firm is not then representing and has not previously represented You in the same matter or a matter substantially related to the same matter, and (ii) the representation of the other client is in accordance with the applicable ethical and professional rules governing the conduct of lawyers ("Rules of Professional Conduct"). For example, You may be a creditor in

Bankruptcy Related Matters in which the Firm is representing the Debtor or another creditor.

[3] ***The Client agrees that it will not assert that this instant Engagement is a basis for disqualifying the Firm from representing others in future matters in which the Firm is retained to represent a party in Bankruptcy Related Matters***. The Parties agree, however, that the Firm will not represent plaintiffs in bankruptcy adversary proceedings involving claims for bad faith or extra-contractual coverage against You or Your affiliates. In other circumstances, You agree to promptly evaluate requests for waiver of any future potential conflicts.

[4] ***Further, You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for You in this matter, even if the interests of such clients in those other matters are directly adverse to You.*** We agree, however, that Your consent to the potentially conflicting representations described in the preceding sentence shall apply to Bankruptcy Related Matters only.[11]

By its terms, the *Warren Pumps* waiver unambiguously applies to this case.

In paragraph [2], the insurers agreed that Young Conaway "may represent . . . other clients in connection with . . . bankruptcy . . . proceedings, and . . . trusts established pursuant to [S]ection 524(g)," so long as the matter for the other client is not "substantially related" to *Warren Pumps*. APP529. In paragraph [3], the insurers agreed "not to assert" that the *Warren Pumps* engagement "is a basis for disqualifying" Young Conaway in a bankruptcy or Section 524(g) matter. *Id.* And in paragraph [4], the insurers more generally confirmed that Young Conaway "may

---

[11]  APP529-30 (Patton's first supplemental declaration; emphases and paragraph breaks added for clarity); *see also* APP564-65.

undertake in the future to represent . . . new clients in any [in bankruptcy or Section 524(g)] matter that is not substantially related to [*Warren Pumps*], even if the interests of such clients in those other matters are directly adverse to you."  APP530. Each of these highlighted statements unambiguously authorizes Young Conaway's (and, by extension, Patton's) participation in this Section 524(g) case, which has absolutely nothing to do with *Warren Pumps*.  *See supra* at 15-17.

Moreover, there is no doubt the *Warren Pumps* waiver is valid under Rule 1.7, which simply requires that the waiving client "materially understand[] the material risks that the waiver entails."  Model Rule 1.7 cmt. 22; *see Congoleum*, 426 F.3d at 691 (requiring "truly informed consent").  As the bankruptcy court found after reviewing the waiver and considering the other evidence: (1) the insurers here were "sophisticated parties" and repeat players in "mass tort bankruptcy cases" with sufficient information to understand the waiver and its associated risks; (2) the waiver itself was clear and specific; and (3) the waiver "evidence[d] an appreciation of both bankruptcy and insurance substantive and procedural law."  APP568-69. Taking all this into account, the court properly concluded that the waiver is "effective" because "any assertion that [the insurers] could not or did not understand the risks associated with retaining [Young Conaway] to represent them in the *Warren Pumps* lawsuit simply rings untrue."  APP569.

c. The Insurers challenge the bankruptcy court's holding as an abuse of discretion on multiple grounds. Specifically, they assert that the waiver is ineffective because (1) it fails to explain the associated risks; (2) it fails to "identify the potential opposing party"; and (3) this case and *Warren Pumps* are "substantially related," thereby triggering the waiver's exception. Br. 38-39. These arguments all fail.

*First*, by its plain terms, the waiver *does* explain the risks. It contains specific references to the relevant subject areas, types of matters, sorts of conflicts, and includes an example of the permitted representations. As the bankruptcy court pointed out, the waiver contains "a precise reference to the very type of conflict that may arise in the future, and the one at issue here." APP565. The waiver is "not abstract or general, but is an exact reference to the types of work" the FCR and Young Conaway were doing, and to the work they were "likely to do in the future" as well as the work "for which they were seeking a waiver." APP565-66. The relevant insurers are "sophisticated parties" with extensive experience in bankruptcy matters—including in matters involving Young Conaway. APP568-69. They plainly understood what they were signing up for.

*Second*, the Insurers are wrong to argue (at 38) that a valid prospective waiver must "identify the potential opposing party." The principal case they cite for that proposition—*Elonex*, 142 F. Supp. 2d at 583—applied the 2001 version of Rule 1.7(b), but Rule 1.7 was amended in February 2002. That amendment allows "a

lawyer to obtain effective informed consent to a wider range of future conflicts than would have been possible under the Model Rules prior to their amendment." Formal Op. 05-436. In particular, "a lawyer is no longer required to name a potential party and the nature of a future matter with specificity." *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, No. 13-cv-2100, 2018 WL 3991470, at *4 (D. Del. Aug. 20, 2018). In the wake of the amendment, the ABA Standing Committee specifically *withdrew* an earlier opinion that endorsed an identification requirement because it was "no longer consistent with the Model Rules." Formal Op. 05-436 (withdrawing Formal Opinion 93-372).

The Insurers also cite a more recent case—*In re IH 1, Inc.*, 441 B.R. 742, 748 (Bankr. D. Del. 2011)—as support for their identification requirement. But *IH 1* did not impose such a requirement. The waiver in that case was "*limited*" to the representation of particular parties, and the court merely enforced that limitation. 441 B.R. at 747. No analogous limitation is present here.

*Third*, the Insurers' argument that this proceeding falls within the waiver's "substantially related" carve-out likewise misses the mark. They say this case and *Warren Pumps* "involve many of the same legal issues," specifically "(i) excess policies' defense obligations; (ii) exhaustion of underlying insurance policies; ([iii]) allocating indemnity and defense payments among the insurance policies; and (iv) which successor corporate entity is entitled to policy proceeds to pay long-tail

claims." Br. 38. But that frames the issues at such a high level of generality to be meaningless, and it is insufficient to establish a substantial relation between the two cases in any event.

Mere similarity among legal issues does not establish a substantial relation. In this context, matters are "substantially related" only if either: "[1] they involve the *same transaction or legal dispute* or [2] there otherwise is a substantial risk that *confidential factual information* as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Model Rule 1.9 cmt. 3 (emphasis added); *De La Cruz v. Virgin Islands Water & Power Auth.*, 597 F. App'x 83, 88 (3d Cir. 2014) (applying this definition); *see also* Model Rule Rule 1.9 cmt 2 ("The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."); Formal Op. 05-436 (applying this understanding of "substantially related" to Rule 1.7); Restatement (Third) of Law Governing Lawyers § 132 (same).

Thus in situations like this one—where the two cases do not involve the same transaction or legal dispute—the substantial-relationship test turns largely on whether the original client shared "confidential factual information" that can be used against that client in the subsequent representation. Model Rule 1.9 cmt. 3; *see* Restatement (Third) of Law Governing Lawyers § 132 cmt. d(iii). This inquiry

requires a "painstaking analysis of the facts." *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F. Supp. 1281, 1283 (D. Del. 1987). "Only if the moving party *proves* the requisite substantial relationship should a lawyer be disqualified." *Id.* (emphasis added). "Vague and unsupported allegations are not sufficient." *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 515 n.2 (D. Del. 2007).

The Insurers offer no *facts* to substantiate their arguments about *Warren Pumps*. They recite only two substantially identical lists of alleged legal similarities. *See* Br. 16, 38. But none of those issues comes close to establishing that Patton or Young Conaway obtained confidential insurer information in *Warren Pumps* that will somehow be used to the Insurers' detriment in this case if he is allowed to serve as FCR. Indeed, all of the supposedly similar issues in *Warren Pumps* were decided *years* ago. *Compare* Br. 38 (listing defense obligations, exhaustion of underlying policies, allocation of indemnity and defense payments, and entitlement to long-tail payments as relevant issues), *with Viking Pump*, 2018 WL 2331990, at *3-4 (explaining that each of those issues was resolved). The mere fact that both proceedings involved disputes over excess-insurance policies does not support an inference that any shared confidences bear on this case. The particulars of the policies are almost certainly different—and the Insurers have introduced no evidence

establishing that they are the same. So it is dubious that any hypothetical confidential information shared in *Warren Pumps* would be relevant here.

The Insurers also generally assert that Young Conaway's *Warren Pumps* representation "give it insight into Certain Excess Insurers' strategies." Br. 38. But "[g]eneral 'litigation thinking'—the general strategic plan or hopes of the lawyer and client on how best to pursue or defend claims—does not satisfy, without more, the substantial relationship test." *Emp'rs Ins. Co. of Wausau v. Munich Reinsurance Am., Inc.*, No. 10-cv-3558, 2011 WL 1873123, at *5 (S.D.N.Y. May 16, 2011). Disqualification under that test occurs "only upon a showing that the relationship between issues in the prior and present cases is 'patently clear'" or "when the issues involved have been 'identical' or 'essentially the same.'" *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739-40 (2d Cir. 1978).

Courts in this circuit routinely reject substantial-relation arguments based merely on allegations that the attorney gained strategic insights from the representation. For example, in *Sonos, Inc. v. D & M Holdings Inc.*, the court held there was no substantial relationship between matters even though both representations involved patent litigation and "Defendants disclosed their general strategy for handling patent litigation" to the attorney during the first representation. No. 14-cv-1330, 2015 WL 5277194, at *4 (D. Del. Sept. 9, 2015). And in *Javorski v. Nationwide Mutual Insurance Co.*, the court reached the same conclusion because

the alleged confidential information at issue merely involved the clients "strategies" for dealing with certain types of insurance claims. No. 06-cv-1071, 2006 WL 3242112, at *7 (M.D. Pa. Nov. 6, 2006). In doing so, it noted that "courts have distinguished an attorney's knowledge of techniques and defense theories from facts and confidential information," and have rejected assertions of a "substantial relationship" based on the former. *Id.*; *see also, e.g.*, *Regalo Int'l, LLC v. Munchkin, Inc.*, 211 F. Supp. 3d 682, 692 (D. Del. 2016) ("[I]f the generalized citation to counsel's knowledge of a prior client's 'litigation philosophies,' 'strategies' and 'risk tolerances' necessarily demonstrated" a substantial relationship then "the floodgates for disqualification would open wide."); *Kaminski Bros., Inc. v. Detroit Diesel Allison*, 638 F. Supp. 414, 417 (M.D. Pa. 1985).

*Finally*, the Insurers' broad interpretation of the "substantially related" carve-out would nullify the obvious purpose of the waiver. That purpose was to allow Young Conaway to continue its nationally recognized practice representing entities in bankruptcy and Section 524(g) proceedings. Such proceedings are often sprawling and involve disputes over insurance policies—as the Insurers well know. Yet their interpretation would allow the "substantially related" exception to swallow the broad waiver, and it would essentially disqualify Young Conaway from any bankruptcy proceeding presenting any "coverage issues" involving the represented insurers.

The parties did not contemplate that absurd result. Rather, as the bankruptcy concluded after a careful analysis of the waiver's language and the relevant context, the Insurers unambiguously agreed to allow Young Conaway (and thus Patton) to participate in cases like this one. That decision was plainly correct, and it was not an abuse of discretion.

d. The Insurers also make the cursory assertion (at 40-41) that the bankruptcy court improperly "excused" a conflict by imposing an ethical wall on Young Conaway well after the firm's alleged conflict arose. That is incorrect. The bankruptcy court proposed the ethical wall as a prophylactic measure even though there was *no* conflict precluding Patton's appointment. As the court explained, the ethical wall was merely "a suggestion made in [the court's] Bench Ruling"—which Young Conaway then "decided to implement." APP564. The court made clear it was not relying on the ethical wall to approve Patton's appointment, and the fact that it was erected after the *Warren Pumps* representation began is therefore of no moment.

Moreover, the Insurers' passing assertion (at 42) that the ethical wall warrants disqualification because "privileged information has been disclosed to the FCR, indicating [certain Insurers'] strategies in the [Debtors'] bankruptcy" is not correct. The Insurers cite no evidence for this claim, and there is none. Indeed, Debtors' discovery responses explained that "only . . . certain publicly available information,

including case pleadings, and non-privileged documents were provided to [] Patton and/or his counsel." APP185; *see also* APP186, APP188, APP189. So the court properly concluded that "the evidence here is that [privileged] information was not shared." APP525. That factual finding was not clearly erroneous.

### 4. The Future Talc Claimants Did Not Need To Waive Any Of The Asserted Conflicts Of Interest

The Insurers also argue that Patton's appointment is improper under Rule 1.7 because the future claimants have not waived alleged conflicts of interest arising from either (1) Young Conaway's alleged representation of current talc claimants, or (2) Young Conaway's representation of the *Warren Pumps* insurers. Br. 7-8, 22, 31. These arguments are meritless, even apart from the fact that Rule 1.7 is categorically inapplicable because the FCR does not serve the future claimants as an attorney. *See supra* at 23-24.

a. The Insurers' threshold problem is lack of standing to assert the interests of the future talc claimants. As noted, bankruptcy appellate standing "is limited to 'persons aggrieved' by an order of the bankruptcy court," which requires that the person's "rights or interests are 'directly and adversely affected pecuniarily.'" *Combustion Eng'g*, 391 F.3d at 214 (citation omitted). More generally, under Article III of the Constitution, a litigant typically "may assert only his own legal rights or interests, and can[]not 'rest a claim to relief on the legal rights or interests

of third parties.'"  *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 298 (3d Cir. 2003) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)).

Here, the Insurers oppose Patton because the *future claimants* have not waived the alleged conflicts of interest.  But the Insurers are not aggrieved by the alleged conflict—the only rights and interests supposedly at issue are those of the future claimants.  And as the bankruptcy court in *Mid-Valley* explained when rejecting a similar insurer-led challenge to an FCR appointment, "insurers have no standing to raise the interests of the asbestos claimants, either present or future."  305 B.R. at 433; *see also Grace*, 2004 WL 5517843, at *3-4 (rejecting insurer standing to challenge FCR appointment).  The Insurers' effort to invoke the rights of future talc claimants should be rejected at the threshold.

The bankruptcy court found standing based on *Congoleum*.  APP517-18.  But that case is readily distinguishable.  It involved insurers' standing to appeal the appointment of "special insurance counsel" to represent Chapter 11 debtors in insurance-related negotiations with asbestos claimants and insurance companies over a pre-packaged bankruptcy plan.  *Congoleum*, 426 F.3d at 681-83, 685-87.  The court allowed the insurers to argue that the "special insurance counsel" had a conflict of interest based on his prior representation of certain current claimants, emphasizing that the retention of the lawyer "will affect the resolution of issues that may directly affect the rights of insurers and fairness to the asbestos claimants."  *Id.* at 685.

Here, by contrast, the FCR appointment will not "directly affect the rights of insurers" in any material way. And under the Model Rules, "the general rule is that only a former or current client has standing to bring a motion to disqualify counsel on the basis of a conflict of interest," subject only to an exception for when an ethical breach is "sufficiently severe to call in question the fair and efficient administration of justice." Ann. Model Rules of Prof'l Conduct r. 1.7 (9th ed. 2019) (internal quotation marks omitted). The alleged conflict here—unlike in *Congoleum*—does not rise to that standard.

This Court should rigorously police the standing requirements here, especially in light of the Insurers' transparent effort to invoke conflicts rules to gain tactical advantages from distraction and delay. The Insurers' argument that Patton cannot fairly represent the interests of future claimants rests on the notion that he will be biased *in favor of the Insurers* due to Young Conaway's work for some of them in *Warren Pumps*. This Court should not be fooled by this patently insincere claim. It is precisely in cases like this one—where the conflict is being asserted is a cynical ploy by a third party asserting no actual harm to itself—that standing requirements are most important. *See generally Elonex*, 142 F. Supp. 2d at 584 (noting that disqualification motions are "viewed with caution because of the potential for their misuse," and that they are "frequently filed as dilatory tactics intended to divert the

litigation from attention to the merits" (citation and internal quotation marks omitted)).

b.  On the merits, the Insurers assert that Patton has a conflict under Rule 1.7 because Young Conaway was supposedly "soliciting and indeed representing current talc tort claimants" whose interests are adverse to the future claimants.  Br. 30.  But the record shows that is not true:  The bankruptcy court correctly found that Young Conaway does not represent—and has not represented—current talc claimants.  *See* APP563.

At the hearing on his appointment, Patton repeatedly testified that neither he nor his firm represent or have represented talc claimants.[12]  The court "found [Patton's] explanation[s] credible and ha[d] no reason to doubt" his testimony. APP524.  The court also considered the website page introduced by Insurers' counsel at the hearing; that page specifically referenced Johnson & Johnson, a customer of Debtors, and invited longtime users of talcum powders and who contracted ovarian cancer to contact the firm.  *See* APP526, APP510-11.  The court therefore ordered Patton to "supplement his original Declaration to reflect [Young

---

[12] *See* APP407-08 ("Q Mr. Patton, do you also represent, does your firm also represent talc bodily injury claimants? A No."); APP410 ("[Q] [H]ow many talc claimants did you take on engagements for at Young Conaway? A To the best of [my] knowledge, zero."); APP412 ("Q Are they successful in soliciting business in the talc field? A As I said, I think the answer is there are zero.").

Conaway's] engagement, if any, by any clients asserting claims based on exposure to talc." APP526.

Patton's supplemental declaration confirmed that "[n]either Young Conaway nor [he] represent any clients who are asserting claims based on exposure to talc." APP529. In the bankruptcy court's Further Ruling, it found Patton's statement "definitive" and noted that if Young Conaway or Patton "had previously represented any talc claimants, it would have been incumbent on [Patton] to disclose those facts." APP563. As the court observed, however, "[t]here are no such disclosures." *Id.*

The bankruptcy court's factual findings are entitled to great deference and can only be set aside if this Court has a "definite and firm conviction that a mistake has been committed.'" *In re CellNet Data Sys., Inc.*, 327 F.3d 242, 244 (3d Cir. 2003) (citation omitted). Indeed, the clear-error standard of review is even "more deferential with respect to determinations about the credibility of witnesses." *United States v. Igbonwa*, 120 F.3d 437, 441 (3d Cir. 1997) (citation omitted). When the "decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error." *Id.*

The Insurers offer no valid reason for second-guessing the bankruptcy court's careful assessment of the facts. They rely exclusively on the marketing page on Young Conaway's website. *See* Br. 22, 29-31, 36, 45. But the marketing page does

not itself establish that Young Conaway ever actually represented a talc claimant. APP510-11. Moreover, the bankruptcy court thoroughly addressed this issue, both by considering Patton's testimony and requiring him to file a supplemental declaration expressly addressing Young Conaway's representation of current talc claimants. *See* APP563. The court's conclusion that there has been no such representation—and that there is accordingly no conflict under Rule 1.7—should not be disturbed.

c.  The Insurers also appear to argue that Patton's appointment as FCR is barred by Rule 1.7 because the future claimants have not waived any conflict of interest arising from Young Conaway's representation of the insurers in *Warren Pumps*. *See* Br. 7, 22, 31. That argument fails as well.

Even if Rule 1.7 bears on Patton's appointment as FCR (which it does not, *see supra* at 23-24), it makes little sense to apply that rule's waiver standard the same way here as in other contexts. After all, the future claimants have not yet been identified, and—unlike virtually any attorney-client relationship contemplated by the Rules—the FCR is therefore not able to consult with those claimants on *anything*, including waivers. Unsurprisingly, the Insurers have cited no authority disqualifying a potential FCR under Rule 1.7 simply because the FCR had not achieved the impossible task of obtaining an advance waiver from the as-yet-unidentified future claimants. The sole precedent the Insurers offer on this point—*Congoleum*—holds

only that *current* claimants, in an attorney-client relationship with their own counsel, must provide informed consent for a waiver to be effective. 426 F.3d at 691; *see* Br. 31. *Congoleum* said nothing about the FCR's relationship vis-à-vis future claimants, nor did it suggest that future claimants' were "affected client[s]" within Rule 1.7(b)(4) that must provide informed consent.

The only reasonable way to apply the principles underlying Rule 1.7 in the FCR context is to allow the bankruptcy court to determine whether a proposed FCR can fairly represent the interests of the future claimants, taking into account all relevant facts and circumstances. That approach is consistent with other areas of law in which a court plays an active role in safeguarding the rights of absentee parties. For example, in the class-action context, "the court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity, by approving appropriate representative plaintiffs and class counsel." *Gen. Motors Corp.*, 55 F.3d at 784; *see also In re Cendant Corp. Secs. Litig.*, 404 F.3d 173, 187-88 (3d Cir. 2005) ("In traditional common fund cases, the court acts almost as a fiduciary for the class, performing some of the roles—i.e., monitoring and compensating class counsel— that clients in individual suits normally take on themselves.").

So too here. Indeed, the Bankruptcy Code explicitly contemplates this magnified kind of fiduciary role for the bankruptcy court. Section 524(g) bestows broad discretion on the court to weigh all the facts bearing on the choice of FCR,

after which the court decides on behalf of the future claimants whom to appoint. When the bankruptcy court appoints the FCR, its judgment therefore necessarily substitutes for that of the future claimants because they are, by definition, incapable of being identified or speaking for themselves. And the FCR's work remains subject to the court's ultimate supervision, as Section 524(g)(4)(B)(ii) specifically requires the court to determine that any proposed plan "is fair and equitable" to future claimants.

Here, the court found that Patton was "independent of the debtors and other parties-in-interest in the case." APP527; *see supra* at 12-13. The court also found that he is "able to act with undivided loyalty to demand holders." APP527. Those conclusions were not an abuse of discretion.

## C.    The Bankruptcy Court's Discovery Ruling Was Not An Abuse Of Discretion

Finally, the Insurers complain that they "were prevented from obtaining discovery" and assert that the bankruptcy court erred in denying their motion to compel. Br. 20, 43-46. But the Insurers dragged their feet in pursuing discovery, failed to comply with the court's instructions on how to raise discovery disputes, and issued discovery requests that did not "relate[] to the appointment of the legal representative." APP525. The court's discovery ruling was thus entirely reasonable.

Discovery orders are reviewed for abuse of discretion, *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 323 (3d Cir. 2003), and such a ruling "will not be reversed

52

without determining that it resulted in actual and substantial prejudice and was a 'gross abuse of discretion resulting in fundamental unfairness,'" *Summy-Long v. Penn. State Univ.*, 715 F. App'x 179, 184 (3d Cir. 2017) (citation omitted). The Insurers have not met that exacting standard here.

As the bankruptcy court observed, the Insurers own delay contributed to the denial of their motion to compel. The initial hearing on the FCR's appointment was continued "so that discovery could take place"—yet no depositions were noticed. Nor did the Insurers approach the court so that disputes could be resolved in a timely fashion. APP520. The Insurers did not pursue any action on Debtors' discovery responses for two weeks, and they waited to file their motion to compel until a week before the rescheduled hearing on the FCR's appointment. *See* APP285, APP520. This flouted the court's repeated instructions to be prompt and contact chambers if disputes arose. *See* SA228-29; *cf.* SA561 ("Had discovery disputes been promptly brought before me they could have been addressed before the hearing.").

The Insurers also assert that the denial of their discovery motion was improper because Patton's disclosures "contained glaring omissions" requiring further discovery. Br. 44-45. The Insurers take issue with Patton's initial disclosure that "Young Conaway represents National Union and a half dozen other of Imerys' alleged insurers 'in insurance coverage disputes that relate to environmental liabilities including asbestos claims.'" *Id.* They argue that this disclosure was

incomplete because it failed to disclose the case names or elaborate on conflict waivers. *Id.* But Patton's declaration went on to explain that all these cases are "unrelated to talc claims or the Debtors." APP106. The level of detail in Patton's declarations was tailored to this bankruptcy. And as the court noted, "much of the discovery propounded by the Certain Excess Insurers" was directed at discovering what information Debtors shared with the FCR, which was simply not relevant "to the appointment of the legal representative." APP525.

The Insurers are also wrong to argue (at 45) that insufficient information was provided about Young Conaway's relationship to current talc claimants. As Patton made clear, Young Conaway does not now—and has not ever—represented such claimants. APP563. No additional disclosures were necessary on this point.

The bankruptcy court thus reasonably concluded that "the process in this case [was] sufficient." APP520. Appellants have identified neither the "actual and substantial prejudice" nor the "gross abuse of discretion resulting in fundamental unfairness" that would merit overturning the court's discovery ruling. *Summy-Long*, 715 F. App'x at 184. The discovery issue poses no obstacle to affirming Patton's appointment as FCR.[13]

---

[13] The Insurers do not independently challenge Young Conaway's retention as the FCR's counsel. That issue is completely omitted from their brief's "Statement of Issues," and their appendix does not even include the retention order. *See* Br. 8-9; APP1-745 (omitting ECF No. 669). Young Conaway's retention is therefore not

# CONCLUSION

For the foregoing reasons, the bankruptcy court's orders should be affirmed.

Dated:  December 16, 2019

Roman Martinez[*]
 *Counsel of Record*
Gregory B. in den Berken[*]
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004-1304
(202) 637-2200
roman.martinez@lw.com
greg.indenberken@lw.com

Jeffrey E. Bjork[*]
Amy C. Quartarolo[*]
Helena G. Tseregounis[*]
LATHAM & WATKINS LLP
355 South Grand Avenue
Suite 100
Los Angeles, CA 90071-1560
(213) 485-1234
jeff.bjork@lw.com
amy.quartarolo@lw.com
helena.tseregounis@lw.com

Respectfully submitted,

*/s/ Michael J. Merchant*

Michael J. Merchant (Bar No. 2981)
Marcos A. Ramos (Bar No. 4450)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
merchant@rlf.com
ramos@rlf.com

Richard A. Levy[*]
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
richard.levy@lw.com

*Counsel for Appellees Imerys Talc America, Inc.,*
*Imerys Talc Vermont, Inc., and Imerys Talc Canada, Inc.*

---

part of this appeal.  That said—to be absolutely clear—Debtors believe Young Conaway's appointment was proper for essentially the same reasons as Patton's appointment was proper, as well as for the reasons set forth in Patton's brief.

 [*] admitted *pro hac vice*

## CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Bankruptcy Procedure 8015(h), I certify that this brief complies with the type-volume limitation of Rule 8015(a)(7)(B) because this brief contains 12,864 words, excluding any items exempted by Rule 8015(g). And this brief complies with the typeface requirements of Rule 8015(a)(5) and the type-style requirements of Rule 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Michael J. Merchant*
Michael J. Merchant

# ADDENDUM

## Pursuant to Federal Rule of
## Bankruptcy Procedure 8014(d)

**TABLE OF CONTENTS**

| Description | Page |
|---|---|
| 11 U.S.C. § 101(14) | ADD-1 |
| 11 U.S.C. § 327 | ADD-1 |
| ABA Model Rule of Professional Conduct 1.7 | ADD-1 to ADD-2 |

## § 101. Definitions

In this title the following definitions shall apply:

* * *

(14) The term "disinterested person" means a person that-

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

* * *

## 11 U.S.C. § 327(a)

## § 327. Employment of professional persons

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

* * *

## ABA Model Rule of Professional Conduct 1.7

## Rule 1.7: Conflict of Interest: Current Clients

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.